**Amory H. BRADFORD, Plaintiff-Appellant,**

v.

**The NEW YORK TIMES COMPANY, Defendant-Appellee.**

**No. 784, Docket 73-2264.**

United States Court of Appeals, Second Circuit.

Argued April 29, 1974.

Decided June 21, 1974.

J. Asa Rountree, New York City (Debevoise, Plimpton, Lyons & Gates, Joseph Leibowitz, New York City, of counsel), for plaintiff-appellant.

John W. Castles 3d, New York City (Lord, Day & Lord, Muriel Bell, Stephen M. Hudspeth, New York City, of counsel), for defendant-appellee.

Before WATERMAN, FRIENDLY and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

This is an appeal from a judgment dismissing the plaintiff's complaint after a non-jury trial before Hon. Morris E. Lasker, United States District Judge, Southern District of New York, which was conducted in October, 1972. Judge Lasker's opinion, not yet reported, was filed on July 17 and the judgment appealed from was entered on July 18, 1973. Affirmed.

The plaintiff, Amory H. Bradford (Bradford), was the General Manager, Vice President and a Director of the New York Times Company (Times) at the time of his voluntary resignation on June 6, 1963. He had been employed by the Times since 1947 in various executive capacities. At the time of his departure and for several years before, Bradford had broad and vital corporate responsibilities. He was in charge of all business operations, reporting directly to the publisher. He headed the Times' advertising, circulation, production and promotion departments. He was responsible for acquiring newsprint. He set policy for the advertising department, including the fixing of rates. He was unquestionably the major figure on the business side of the newspaper.

In 1959, the Times adopted an Incentive Compensation Plan (Plan), and Bradford participated in its drafting and, as a director, voted for its approval. The purpose of the Plan was "to retain and attract executives and employees who enhance [the Times'] tradition and contribute to its success." The Plan provided for "retirement units" for selected executives and other personnel. The units were based upon the value of the participant's service to the Times. The units were credited to the account of each participant and, upon his death, retirement or severance, he would receive in 10 equal annual installments shares of stock in the Times equal in sum to the number of his units.

Paragraph 14 of the Plan provided:

a. Each Participant shall enter into an agreement with The Times which shall provide that during the period payments will be made to him hereunder and in consideration of such payments, the Participant will not engage in any business or practice or become employed in any position in competition with The Times or which is otherwise prejudicial to the interests of The Times, and that he will hold himself available to The Times for reasonable consultation and other services.

b. In the event of any breach of such agreement by the Participant, The Times, in its sole discretion, may discontinue the installments still unpaid.

Paragraph 27 of the Plan provided:

c. Any decision or action taken by The Times, the Board or the Committee appointed by the Board to administer the Plan, arising out of or in connection with the construction, administration, interpretation and effect of the Plan shall be conclusive and binding upon all Participants and any person claiming under or through any Participant.

After the Plan had been adopted, Bradford was designated as a participant and was awarded 50 units for each of the years 1959, 1960, 1961 and 1962. On December 22, 1959, he entered into an agreement pursuant to Paragraph 14 of the Plan. It provided:

In accordance with Part I of The New York Times Incentive Compensation Plan, in which I am a participant, I agree that during the period that payments are made to me under the Plan and in consideration of such payments I will not engage in any business or practice or become employed in any position in competition with The Times or which is otherwise prejudicial to the interests of The Times and that I will hold myself available to The Times for reasonable consultation and other services.

At the time of his resignation in June, 1963, Bradford had accumulated 205 units (including a dividend credit). In July, 1963, Bradford received his first annual installment under the Plan, consisting of 21 shares of stock (then worth about $7000), leaving a balance due of 184 units (then worth about $60,000). The Times further voluntarily paid him six months salary amounting to $40,000.

On October 21, 1963, Bradford advised Harding Bancroft, a senior executive of the Times, that he was taking a position as an assistant to Mark Ferree, General

Manager of Scripps-Howard Newspapers. That organization released an announcement of this fact to the press on October 23, 1963. Bradford became Assistant General Manager of Scripps-Howard Newspapers on January 1, 1964. This organization was a division of E. W. Scripps Company, which owned or controlled a chain of 16 newspapers in the United States, one of which was the New York World-Telegram & Sun. The division provided management services for all of the papers in the chain, including the World-Telegram. Bradford's salary was fixed at $65,000 for one year. After consultation among executives and with outside counsel, the Times, on November 15, 1963, notified Bradford, by a letter which cited Paragraph 14 of the Plan, that by assuming his new position he had relinquished any further rights he might have had under the Plan. In response, by letter dated November 19, 1963, Bradford indicated that, while he did not contest that the Times had the right to discontinue the payments if it considered that a breach had occurred, he did not consider his new position to be "in any material way in competition with The Times or . . . otherwise prejudicial" to its interests. Before that letter was received (Bradford had written it while on vacation in Greece), the Times' Board had approved the discontinuance of his payments, and it reaffirmed its determination on reconsideration of the matter on December 19, 1963.

Bradford's employment at Scripps-Howard terminated on December 31, 1964. In April, 1966, he wrote to the Times requesting a resumption of payments. Due to stock splits and market changes, Bradford's 184 units had risen in value from $60,000 to about $230,000. On May 2, 1966, the Times advised Bradford that since he had breached his agreement, his rights had terminated and were not resurrected by his subsequent separation from Scripps-Howard. On October 2, 1967, this diversity suit was commenced for breach of contract, seeking delivery of 12,300 shares of Class A common stock of the Times plus cash for dividend credits. The complaint was later amended to include a count alleging a violation of section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, for which Bradford sought treble damages and costs, including reasonable attorneys' fees, pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15.

I

On appeal, Bradford principally urges that the noncompetition agreement which he executed pursuant to the Plan constituted a restraint of trade which is void and unenforceable under New York law. The court below found that there was no restrictive covenant in restraint of trade because the agreement did not absolutely prohibit Bradford from working for a competitor, but rather offered him an "attractive option," the retention of substantial retirement benefits. The court concluded that this was an "employee choice" case under New York law and therefore not to be tested by common law restraint doctrines.

Since the Plan and the agreement executed pursuant to its terms did limit Bradford's employment opportunities after he severed his relationship with the Times, we are dealing with a restraint which is valid only if it is found to be reasonable. The New York Court of Appeals has announced that there are powerful considerations of public policy which militate against the sanctioning of the loss of a man's livelihood. The covenant not to compete with a former employer is subject to an "overriding limitation of reasonableness." *Karpinski v. Ingrasci,* 28 N.Y.2d 45, 49, 320 N.Y.S.2d 1, 4, 268 N.E.2d 751, 753 (1971); *Purchasing Associates, Inc. v. Weitz,* 13 N.Y.2d 267, 272, 246 N.Y.S.2d 600, 603–604, 196 N.E.2d 245, 247–248 (1963). In view of the strong public policy of the state, we cannot accept the theory that New York has adopted the so-called "employee choice" doctrine, which is alleged to make judicial determination of reasonableness unnecessary. *Kristt v. Whelan,* 4 A.D.2d

195, 164 N.Y.S.2d 239 (1st Dep't 1957), aff'd without opinion, 5 N.Y.2d 807, 181 N.Y.S.2d 205, 155 N.E.2d 116 (1958), which is urged as the basis for the rule, has not been discussed in any subsequent court of appeals decision.[1] The cases in New York have consistently been concerned with occupational limitations upon former employees, and we do not believe that *Kristt* is of significance in light of Chief Judge Fuld's searching opinions for the court of appeals in *Karpinski* and *Purchasing Associates*.

■ In any event, we cannot characterize the contract before us as one which afforded Bradford a choice of alternative performances. Bradford's agreement executed pursuant to Paragraph 14 of the Plan provided: "I agree that . . . I will not engage in any business or practice . . . ." The Plan itself (Paragraph 14) does not provide simply for the conditional forfeiture of benefits, but refers to an "agreement" not to compete and for discontinuance of unpaid installments in the event of a "breach." New York recognizes that on occasion a contract may truly provide one of the parties the alternative of one performance or another. Hasbrouck v. Van Winkle, 261 App.Div. 679, 27 N.Y.S.2d 72 (3d Dep't 1941), aff'd without opinion, 289 N.Y. 595, 43

N.E.2d 723 (1942). We do not construe this contract to be of this category. Bradford promised only to avoid competing and to hold himself ready for consulting service. The contract gave him no options with respect to his performance. In the event that the contract was breached, the Times reserved the right to withhold stock payments. In our view, this was provision for liquidated damages, which is a normal provision in contracts of this nature and which New York has consistently held to be, not an alternative contract affording the employee an option, but rather one specifically performable at the option of the employer. Karpinski v. Ingrasci, *supra*, 28 N.Y.2d at 52, 320 N.Y.S.2d at 7, 268 N.E.2d at 755; Diamond Match Co. v. Roeber, 106 N.Y. 473, 486, 13 N.E. 419, 423–424 (1887); Restatement of Contracts, § 325 & comment b at 492–93 (1932).[2] As Professor Corbin has written, "if there is a promise to render one particular performance, with a provision for payment of a sum of money as a penalty or as liquidated damages for breach, without anything more, the contract is not an alternative contract." 5A A. Corbin, Contracts § 1213, at 436 (1964).

■ The court below indicated that the forfeiture of stock here did not con-

---

1. That case has been relied upon in several lower court cases which have enforced comparable restraints without inquiry with respect to or even any discussion of reasonableness. See Kidd v. Oakes, 39 Misc.2d 645, 241 N.Y.S.2d 403 (Sup.Ct.App. Term 1963) (per curiam); Kerpen v. First Investors Corp., 45 Misc.2d 793, 257 N.Y.S.2d 880 (Sup.Ct.1965), aff'd without opinion, 26 A. D.2d 620, 272 N.Y.S.2d 687 (1st Dep't 1966); In re Kumm, 36 Misc.2d 816, 233 N. Y.S.2d 598 (Sup.Ct.1962). In Jacobus v. Massachusetts Mut. Life Ins. Co., 91 F. Supp. 674 (W.D.N.Y.1950), the court did not discuss the issue of possible restraint upon an employee and cited no cases.

2. We do not overlook the language of Paragraph 14(b) of the Plan, which provided that in the event of a breach, the Times "may discontinue the installments still unpaid." This by no means gives Bradford the option to perform or not. As the court of

appeals pointed out in Rubinstein v. Rubinstein, 23 N.Y.2d 293, 297–298, 296 N.Y.S.2d 354, 358–359, 244 N.E.2d 49, 51–52 (1968), the presence of a liquidated damages clause does not bar specific performance unless there is language which provides that recourse to liquidated damages shall be the "sole" remedy. The court there also noted the absence of the use of the term "option," which is also a factor here. The courts of New York will look to the reasonableness of the agreement whether the employer seeks equitable relief or damages. Paramount Pad Co. v. Baumrind, 4 N.Y.2d 393, 175 N.Y.S.2d 809, 151 N.E.2d 609 (1958), is a case in which the employer sought damages rather than injunctive relief and the court applied a reasonableness test. Hence, we see no pertinence here in the claim that whether or not the restriction is reasonable is of no judicial concern since the Times has failed to seek equitable relief. The remedy sought by the employer is not pertinent.

stitute a liquidated damages clause because no "sum" was fixed in the agreement and, furthermore, because the employee's units would vary according to the importance of his position, length of service and the value of units paid at different times. The proposition that liquidated damages clauses are only valid if fixed sums of money are involved rather than the forfeiture of property is not supportable. The Restatement of Contracts § 340 refers to the forfeiture of "a sum of money or other property." The fact that the amount of stock forfeited will vary with the value and length of the employee's service as well as the time of the breach only confirms the proposition that it is a valid liquidated damages clause which is the product of some good faith effort on the part of the parties to estimate at the time of contracting the damage which would flow from a breach. In fact, setting a fixed amount for any breach irrespective of its gravity or the probable damage to be contemplated might well classify the clause as an unenforceable penalty. Lenco, Inc. v. Hirschfeld, 247 N.Y. 44, 159 N.E. 718 (1928); Seidlitz v. Auerbach, 230 N.Y. 167, 129 N.E. 461 (1920).

At the time Bradford commenced this suit, the value of his "retirement units" had escalated to $500,000, and the argument is made that this disparity between the amount forfeited and the damages to be reasonably anticipated renders the provision an unlawful penalty. However, it is well settled that the reasonableness of the sum selected as liquidated damages will depend upon the estimate of the parties at the time the agreement was made, not at the time of breach or at the time suit was commenced. United States v. Bethlehem Steel Co., 205 U.S. 105, 27 S.Ct. 450, 51 L.Ed. 731 (1907); Curtis v. Van Bergh, 161 N.Y. 47, 55 N.E. 398 (1899);

Restatement of Contracts § 339 (1932); C. McCormick, Damages § 150 (1935); 5 S. Williston, Contracts § 777, at 683–85 (3d ed. W. Jaeger 1961).[3] There is no claim here that the units initially determined on the basis of length and value of service were so disproportionate as to constitute a penalty. Obviously, the possibility of fluctuation in value was contemplated by the parties, and Bradford must have realized this when he decided to work for Scripps-Howard.

In sum, we are persuaded that we are presented with a restraint upon a former employee with a provision for liquidated damages in the event of a breach. The reasonableness of the restraint must be tested by the facts in the case before the court. Karpinski v. Ingrasci, *supra*, 28 N.Y.2d at 49, 320 N.Y.S.2d at 4, 268 N.E.2d at 753. We do not agree that *Kristt* represents the law of the state if it be construed to eliminate any inquiry into reasonableness because of some purported doctrine of "employee choice." The inquiry remains whether or not the restraint was reasonable and the contract was breached.

## II

In determining whether or not the restraint was reasonable, we are faced in this case with a question which thus far has not been discussed in any of the New York cases but which we think is pertinent and logically would be considered by the courts of that state. Common law courts in general and the courts of New York in particular have distinguished between, on the one hand, a covenant barring an employee or partner from competing while he is employed or engaged in the business of the partnership (e. g., Lynch v. Bailey, 275 App.Div. 527, 90 N.Y.S.2d 359 (1st Dep't), aff'd without opinion, 300 N.Y. 615, 90 N.E.2d 484 (1949)) and covenants by the seller of a business and its

3. The court below found that the amount of $60,000 was, in any case, not disproportionate to the expected damages. The stock involved, when traded publicly, rose to a peak of $900,000 in value in 1963, but apparently was worth $500,000 if it had been taken at the times provided in the agreement. In view of the position taken below and here, the actual intermediate values are irrelevant.

good will to refrain from competing with the buyer (e. g., Hackenheimer v. Kurtzmann, 235 N.Y. 57, 138 N.E. 735 (1923)) and, on the other hand, covenants which bar an employee from competing after he has severed his relationship with his employer. E. g., Purchasing Associates, Inc. v. Weitz, *supra*. There is more flexibility in the first two categories in determining whether or not the covenant is reasonable because the employee or seller is receiving some consideration for the covenant—his salary is being paid or he has received consideration for the sale of the good will. The employee in the last category, however, may become a public charge, and, in any event, it is distasteful to curtail his opportunity to make a living. The case before us presents no such elements of unfairness. Bradford's resignation did not terminate his employer's obligations. He was to receive annual installments of stock for a ten-year period so long as he abided by his promise not to compete. There was a continuing consideration being paid for his loyalty and good will. While this was a restraint upon his liberty, it can hardly be described as unreasonable. Had he persevered, his reward would have been great indeed. In the employee restraint cases we have considered, breach led either to injunctive relief, in which case of course the employee was prevented from going elsewhere and at the same time received no new or continuing consideration from his former employer, or to the forfeiture of an amount posted by the employee or a judgment against him for the sum fixed as liquidated damages. Here, Bradford paid nothing but merely disabled himself from collecting the continuing payments made by the Times. We

think, therefore, that the case has an element not present in the prior employee cases in which there was no consideration for the post-employment covenant against competition, and that this factor cannot be overlooked in determining the reasonableness of the restraint presented here.

Appellant argues that New York law prohibits the enforcement of an agreement which restricts the competition of a former employee unless he threatens to disclose trade secrets or solicits business directly from former customers. However, in *Purchasing Associates*, Chief Judge Fuld stated:

> If, however, the employee's services are deemed "special, unique or extraordinary", then, the covenant may be enforced by injunctive relief, if "reasonable," even though the employment did not involve the possession of trade secrets or confidential lists.

13 N.Y.2d at 272, 246 N.Y.S.2d at 604, 196 N.E.2d at 248.

The earlier description of Bradford's duties should leave no real doubt that he, if anyone at the Times, was in the category "special, unique or extraordinary." He was the No. 2 executive of the publication directly responsible for its business operation, which involved circulation, advertising, production and promotion. He was privy to confidential discussions regarding possible mergers and joint printing arrangements with other New York papers. He reported directly to the publisher.[4]

We see no other elements of unreasonableness in the agreement. The time fixed, ten years, is commensurate with the payment of benefits. There is no geographical limitation set forth, but, by

---

4. New York cases holding employees not to be "special, unique or extraordinary" include: Clark Paper & Mfg. Co. v. Stenacher, 236 N.Y. 312, 140 N.E. 708 (1923) (drummer); Kaumagraph Co. v. Stampagraph Co., 235 N.Y. 1, 138 N.E. 485 (1923) (printers of fabric designs); Frederick Bros. Artists Corp. v. Yates, 271 App.Div. 69, 62 N.Y.S.2d 714 (1st Dep't 1946), aff'd without opinion, 296 N.Y. 820, 72 N.E.2d 13 (1947) (theatrical booking agent); Corpin v. Wheatley, 227 App.Div. 212, 237 N.Y.S. 205 (4th Dep't 1929) (beauty improver); Magid v. Tannenbaum, 164 App.Div. 142, 149 N.Y.S. 445 (1st Dep't 1914) (traveling representative for tailors); Small v. Kronstat, 175 Misc. 626, 24 N.Y.S.2d 535 (Sup.Ct. 1940) (skilled watch artisan). Bradford's responsibilities and skills were of an obviously higher order.

the terms of his agreement, Bradford is only precluded from competition which is detrimental to the Times, which is no greater than that to which the paper is entitled.

While not mentioned in the complaint, the appellant urges that the agreement violates the Donnelly Act, N.Y.Gen.Bus.Law § 340(1), which renders illegal contracts which restrain competition or the free exercise of any activity in the conduct of any business, trade or commerce. However, it is well understood that the New York statutory prohibition is no broader than the common law and that it adds no further strictures on otherwise reasonable restraints. See In re Davies, 168 N.Y. 89, 61 N.E. 118 (1901); In re Jackson, 57 Misc. 1, 107 N.Y.S. 799 (1908). Muggill v. Reuben H. Donnelley Corp., 62 Cal.2d 239, 42 Cal.Rptr. 107, 398 P.2d 147 (1965). relied upon by the appellant, did apply state law to void an employee restriction comparable to the one before us. However, that decision rested upon section 16,600 of the California Business and Professions Code providing that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." That section had been interpreted by California courts as an absolute bar to any employee restraints. Chamberlain v. Augustine, 172 Cal. 285, 288, 156 P. 479, 480 (1916). In 1949, Justice Dore in his opinion in Lynch v. Bailey, *supra*, had already noted the strict construction given to the California statute by the courts of that state. 275 App.Div. at 5, 90 N.Y.S.2d at 365. New York, on the other hand, has con-

sistently followed the rule of reason approach, whether the action is based on common law or Donnelly Act grounds. See Paramount Pad Co. v. Baumrind, 4 N.Y.2d 393, 175 N.Y.S.2d 809, 151 N.E. 2d 609 (1958). In sum, we find the agreement fair and reasonable under the law of New York.

## III

The appellant argues that the agreement before us is so flagrantly unreasonable that it violates section 1 of the Sherman Act, and even urges this court to find that the employee non-competition covenant constitutes a *per se* violation of the Act. Having found the agreement before us to be reasonable, we of course must decline without reluctance to find that it constitutes a *per se* violation. Not only has the appellant failed to supply us with any case holding an employee restrictive covenant to be a *per se* violation, but no court applying the rule of reason has ever held such a contract violative of section 1 of the Sherman Act.[5]

Judge Taft's classic opinion in United States v. Addyston Pipe & Steel Co., 85 F. 271 (6th Cir. 1898), aff'd, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899), relied upon by both sides here, did presage the rule of reason and the subsequent decisions of Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), and United States v. American Tobacco Co., 221 U. S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (1911), which limited the Sherman Act's application to undue or unreasonable restraints of trade in light of their common law antecedents.[6] These cases ef-

5. Appellant's major reliance for the proposition that employee restrictive covenants are violative of the Sherman Act is Professor Blake's article Employee Agreements Not to Compete, 73 Harv.L.Rev. 625, 628 n. 8 (1960). However, it is not at all suggested in the cited footnote that such agreements are "*per se*" violative. It is indicated that if "the required effect on commerce is present, unreasonable postemployment restraints would seem clearly to violate the Sherman Act . . . ." It is very du-

bious that Bradford's employment with Scripps-Howard had more than a de minimis effect, if any, upon interstate commerce. In any event, the comment is limited to "unreasonable" restraints with no suggestion that all restraints are *per se* unreasonable.

6. The common law hardly provided a reasonable basis for prediction of the outcome of litigation involving restraints. Dewey, The Common-Law Background of Antitrust Policy, 41 Va.L.Rev. 759, 761 (1955). Of

fectively overcame any earlier intimations that all restraints of trade, whether valid or not at common law, were now literally prohibited by section 1 of the Sherman Act. E. g., United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1897). See M. Handler, Antitrust in Perspective 4–6 (1957).

It is true that certain agreements because of their "pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable . . . ." Northern Pacific Ry. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). However, the litany of *per se* restraints, which includes horizontal price-fixing or division of markets, group boycotts and tying provisions, involves arrangements which have a major trade regulatory impact which is not at all discernible here. As Mr. Justice Marshall noted in United States v. Topco Associates, Inc., 405 U.S. 596, 607–608, 92 S.Ct. 1126, 1133, 31 L. Ed.2d 515 (1972): "It is only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act." See also White Motor Co. v. United States, 372 U.S. 253, 261–263, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). Although employee restraints have been known to the common law since the 15th century, their evolving history illustrates that rule of reason considerations continue to apply; and a state court or, in a diversity case, a federal court applying state law, provides the usual forum for protecting the employee and whatever interest the public may have. There is certainly a total absence of federal Sherman Act experience. There is therefore not enough here to justify our acceptance of the invitation to classify such a restraint as a *per se* violation of the Sherman Act.

IV

██ The appellants further urge that, in any event, Bradford did not breach the agreement. The pertinent language of the agreement is: "I will not engage in any business or practice or become employed in any position in competition with The Times or which is otherwise prejudicial to the interests of The Times . . . ." Appellant construes this language to mean that it precludes Bradford either from going into business on his own in competition with the Times or from taking a position which involves him personally in prejudicial competition with the Times. The court below, properly in our view, construed the agreement to prevent Bradford from going to work for a competitor in a position in which his work would assist his employer to better compete with the Times. That would certainly be detrimental or prejudicial to the Times. To construe the clause as urged by the appellant would make the first part of the prohibition precluding him from setting up his own business in competition with the Times mere surplusage.

The court below found that Scripps-Howard was in competition with the Times:

[W]e find that the Times has established by a clear preponderance of the evidence (1) that Scripps and the Scripps chain were, as a unit, in competition with the Times, (2) that the New York World-Telegram was in competition with the Times and (3) that Bradford's work for Scripps breached his agreement with the Times by contributing to the chain as a unit and by benefiting the Telegram as a member of the unit.

██ We do not find it necessary to discuss the district judge's first finding. The substantial competition for reader-

---

course, the fact that incentive plans such as that which we have before us were not known prior to the Sherman Act is not at all decisive. The common law continues, and

emerging schemes of restraint will not escape scrutiny. Cf. Standard Oil Co. v. United States, *supra*, 221 U.S. at 59–60, 31 S.Ct. 502.

ship in New York between the Times and the World-Telegram was established beyond any doubt. While Bradford's affiliation with the World-Telegram was limited, the record does reveal that a major problem of the chain was the financial support of the World-Telegram and that Bradford was directly concerned with the strengthening of its position.

Paragraph 27 of the Plan provided that decisions or actions taken by the Times or its Board, arising out of or in connection with the construction, administration, interpretation and effect of the Plan, "shall be conclusive and binding." Appellant urges that this clause gave the Times no power to determine that a breach had occurred, and that, if it did, it would be contrary to public policy since it would constitute an ouster of the courts from their nondelegable role of enforcing state policies. Gitelson v. Dupont, 17 N.Y.2d 46, 268 N.Y.S.2d 11, 215 N.E.2d 336 (1966), is in point and is precisely contrary to the contention of the appellant. There it was held that the rights of an employee under a comparable retirement plan were purely contractual and that a determination by a pension board that a claimant was ineligible, was, as provided in the agreement, final and conclusive absent a showing by the claimant that the board's ruling was motivated by bad faith or fraud or was arbitrary. See also Menke v. Thompson, 140 F.2d 786, 791–792 (8th Cir. 1944). The lower court in the case before us not only found that a breach did occur, but further commented that it was difficult to find that the Times could have come to any other conclusion. There is no charge of fraud or bad faith here, and the contention that the action was arbitrary finds no support in the record.

Appellant argues that *Gitelson, supra,* is distinguishable since that case did not involve a restrictive covenant. Appel-lant relies on Aimcee Wholesale Corp. v. Tomar Products, 21 N.Y.2d 621, 289 N.Y.S.2d 968, 237 N.E.2d 223 (1968), and American Safety Equipment Corp. v. J. P. Maguire & Co., 391 F.2d 821 (2d Cir. 1968), for the proposition that it is beyond the power of the parties to provide in an arbitration clause, which is asserted to be final and binding upon the parties, a determination as to whether or not a violation of state or federal antitrust laws has taken place. The proposition is unassailable but just as clearly inapplicable here. The Times made a determination that the contract was breached and that Bradford forfeited his rights under the Plan. No determination was made as to whether or not the agreement violated the state or federal trade regulatory laws, and, if it had been made, it would of course not bind this court. This court and not the Times has made the determination that no common law or statutory violation occurred.

Finally, appellant urges that, if a breach occurred, section 14(b), which provided that the Times may "discontinue" payments, should be interpreted to mean "suspend" payments until Bradford completed his service with Scripps-Howard (one year), at which point they should be resumed. In view of the power vested in the Times to interpret the agreement, we agree with the court below that the construction employed by the Times was not arbitrary. It is conceded that the word "discontinue" can mean either "suspend" or "terminate." Allowing an executive of the calibre of Bradford to bring his expertise to a competitor even for a limited time would be injurious to the Times. The construction given by the Times to "discontinue" was to "terminate," and we do not disagree.

Affirmed.