**INTERNATIONAL BUSINESS
MACHINES CORPORATION,
Plaintiff,**

v.

**Stephen C. MARTSON, Defendant.**

**No. 98 CIV. 4956(CM).**

United States District Court,
S.D. New York.

Feb. 5, 1999.

Peter Barbur, Cravath Swaine & Moore, NY, for plaintiff.

Dennis M. O'Dea, Wolf, Block, Schorr & Solis–Cohen LLP, NY, for defendant.

DECISION AND ORDER

McMAHON, District Judge.

This is a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. On October 1, 1998, Plaintiff International Business Machines Corporation ("IBM") brought this action for breach of contract against Defendant Stephen Martson ("Martson"), a former employee of IBM. The complaint alleges that Martson violated his stock option agreements by exercising stock options within six months of working for a competitor and by subsequently failing to repay to IBM the profits that he realized from the exercise.

**Background**

IBM is a manufacturer of personal computers with its principal place of business in New York. The corporation employed Martson for a period of two years, from 1996 to 1998. Martson served as Vice President of Procurement in North Carolina.

IBM maintained a 1994 Long Term Performance Plan ("Plan") in order to keep key senior employees loyal to the company. The "Objective" provision of the Plan described why IBM initiated the Plan:

1. *Objective*

"The IBM Long Term Performance Plan is designed to attract and retain executives and other selected employees whose skills and talents are important to the Company's operations, and reward them for making major contributions to the success of the Company. These objectives are accomplished by making long-term incentive awards under the Plan, thereby providing participants with a proprietary interest in the growth and performance of the Company."

Pursuant to the "Eligibility" provision of the Plan, employees are eligible for an award when, in the judgment of the committee administering the plan or in the judgment of the management of the company, the employee can have a significant effect on the success of the company.

After an employee receives a stock option award and acknowledges acceptance of the terms of a stock option agreement, the award becomes exercisable pursuant to a schedule set forth in the agreement. The stock option award, however, is subject to forfeiture under certain circumstances:

13. *Cancellation and Recission of Awards*

(a) "A Participant shall not render services for any organization or engage directly or indirectly in any business which, in the judgment of the chief executive officer of the Company or other senior officer designated by the Committee, is or becomes competitive with the Company, or which organization or business, or the rendering of services to such organization or business, is or becomes otherwise prejudicial to or in conflict with the interests of the Company..."

(d) "[F]ailure to comply with the provisions of paragraph (a) of this Section 13 prior to, or during the six months after, any exercise, payment or delivery pursuant to an Award shall cause such exercise, payment or delivery to be rescinded. The Company shall notify the Participant in writing of any such recission within two years after such exercise, payment or delivery. Within ten days after receiving such notice from the Company, the Participant shall pay to the Company the amount of any gain realized or payment received as a result of the rescinded exercise, payment or delivery pursuant to an award ..."

Martson received two awards: one on April 15, 1996 and another on March 13, 1997. After receiving the 1996 grant, he signed a Stock Option Agreement, in which he acknowledged reading the terms of the Plan. The agreement further stated:

"You agree that the cancellation and recission provisions of the Plan and this Agreement are reasonable and agree not

to challenge the reasonableness of such provisions, even where forfeiture of options granted is the penalty for violation. If you or IBM brings an action to enforce this Agreement and IBM prevails, you will pay all costs and expenses incurred by IBM in connection with that action..."

"In consideration of this option grant, you agree to comply with the requirements of the Plan and this Agreement, specifically those portions relating to cancellation and rescission of 'Awards'"

. . .

After receiving the 1997 grant, Martson made an audio recording acknowledging that he had read and agreed to the terms of the 1997 stock option agreement, which contained the same provisions as above, as well as the following:

"You understand that, under the terms of the Plan, IBM may cancel or rescind this award under certain circumstances, including, without limitation, if you render services for a competitor prior to, or within six months after, the exercise of any options granted."

The two stock option agreements also had provisions pertaining to jurisdiction and governing law:

*Jurisdiction and Governing Law.* The parties submit to the exclusive jurisdiction and venue of the federal or state courts of New York, County of Westchester, to resolve issues that may arise out of or relate to this agreement or the same subject matter. This Agreement shall be governed by the laws of the State of New York, excluding any conflicts or choice of law rule or principle that might otherwise refer construction or interpretation of this Agreement to the substantive law of another jurisdiction.

Martson exercised his stock options during March, April and June of 1998. On June 12, 1998, Martson informed IBM that he was leaving to work for Compaq Computer Corporation, a direct competitor of IBM. Shortly after his resignation, Mart-son began work with Compaq. On June 29, 1998, IBM demanded payment of the profits that Martson realized from the exercise of the options, pursuant to the Plan provision. When Martson refused to repay IBM, IBM commenced this action for breach of contract.

In his answer, Martson asserted that the awards were "wages" and argued that IBM's attempts to recover his profits amount to a penal forfeiture of those wages in violation of New York's Labor Law (Fourth Affirmative Defense). He also asserts six other affirmative defenses to the complaint: First Affirmative Defense: lack of personal jurisdiction; Second Affirmative Defense: improper venue; Third Affirmative Defense: the forum selection clause is unenforceable because it was imposed upon him subsequent to his initial employment; Fifth Affirmative Defense: the forfeiture provision is unenforceable because IBM has breached the implied covenant of good faith and fair dealing; Sixth Affirmative Defense: the forfeiture provision is unenforceable because it constitutes an unreasonable restraint on alienation; Seventh Affirmative Defense: IBM cannot enforce the forfeiture provision because it has "unclean hands" in that certain IBM executives conspired to constructively discharge Martson.

IBM has moved for judgment on the pleadings.

**Discussion**

The court will grant a motion for judgment on the pleadings pursuant to Fed. Rul. Civ. P. 12(c) when the movant is entitled to judgment as a matter of law. *See Burns International Security Services, Inc. v. International Union,* 47 F.3d 14, 16 (2d Cir.1995). The court must view the facts in a light most favorable to the non-movant. *Id.*

*Jurisdiction and Venue in New York are Proper*

Martson's first three affirmative defenses challenge the enforceability of the

forum selection clause. Martson does not deny that he signed the stock option agreements or that they contained a forum selection clause that sited jurisdiction and venue in the state or federal courts of Westchester County, New York. He simply asserts that the court lacks personal jurisdiction and that venue is "more proper" in the District of North Carolina.

■ Forum selection clauses are generally enforced, *see Stonehenge, Ltd. v. Garcia,* 989 F.Supp. 539, 541 (S.D.N.Y.1998), unless it can be shown that the clause was obtained through fraud or overreaching, or that it would be unjust to enforce it. *See Jones v. Weibrecht,* 901 F.2d 17, 18 (2d Cir.1990). Martson has not alleged any facts to support a conclusion that the clause is unenforceable because of fraud or overreaching. Martson's only argument is that he was required to agree to jurisdiction and venue subsequent to initial employment by IBM. That may be true, but it is neither fraudulent nor overreaching. Thus, the forum selection clause is enforceable, and the various defenses based on jurisdiction and venue are meritless.

*The Stock Options are Not Wages*

■ Martson, like dozens of executives faced with similar forfeitures before him, argues that the stock options he received pursuant to the Plan constitute earned wages under New York's Labor Law § 190(1)[1] and that the forfeiture provision is therefore unenforceable because it violates New York's strong public policy against forfeiture of wages. *See Weiner v. Diebold,* 173 A.D.2d 166, 167, 568 N.Y.S.2d 959, 961 (1st Dept.1991). IBM contends that the stock options granted to Martson are incentive compensation separate from his earned wages and that the forfeiture clause is enforceable pursuant to New York's "employee choice doctrine."

■ Because there is no factual dispute regarding the circumstances surrounding IBM's grant of the options, the question of whether the stock options are earned wages is a question of law properly resolved in a motion for judgment on the pleadings.[2]

It has long been held that stock award plans like this one, whose objectives are to retain talented executives by providing them with a proprietary interest in the growth and performance of the company, are not "wages" under § 190 of the New York Labor Law. *See e.g., Canet v. Gooch Ware Travelstead,* 917 F.Supp. 969, 995 (E.D.N.Y.1996); *Tischmann v. ITT/Sheraton Corp.,* 882 F.Supp. 1358, 1370 (S.D.N.Y.1995); *Samuels v. Thomas Crimmins Contracting Co.,* No. 91 Civ. 6657, 1993 WL 36168, * 7 (S.D.N.Y. Feb.9, 1993). IBM contends that this long line of authority compels the same result in Martson's case. However, the question is not so open-and-shut, because there is a factual distinction between the above cases and this one. In each of the precedents cited by IBM, the executive's bonus or award under a Long Term Plan had either not yet vested or, if vested, had not been exercised. Here, by contrast, the award had vested (albeit subject to forfeiture under the terms of the Plan) and the employee had already exercised the options and had received his money. IBM now demands that Martson give the money back. The question is whether that distinction should lead to a different result.

I conclude that this is a distinction without a difference. In so doing, I choose to follow Judge Eginton's thorough and in-

---

1. New York Labor Law § 190 defines the term "wages" as "the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis."

2. In *Weiner v.Diebold Group, Inc.,* 173 A.D.2d 166, 568 N.Y.S.2d 959 (1st Dept.1991), the court stated that the question of whether incentive compensation is earned wages is a question of fact. In *Weiner,* summary judgment was precluded because of conflicting testimony and memoranda. Here, there are no factual conflicts.

structive opinion in *Rosenberg v. Salomon*, 992 F.Supp. 513 (D.Conn.1997), the case most closely analogous to this one.

The Judge in *Rosenberg* was confronted, as I am, with an allegation that an employee stock award, granted under a Long Term Incentive Compensation Plan governed by New York law, constituted wages. Mr. Rosenberg had already received his shares of stock under the plan; they had been paid into a trust and his right to withdraw them had vested over time. However, the plaintiff in *Rosenberg* had not yet withdrawn his shares. In *Rosenberg*, as in this case, the plan documents provided for divestiture of the fully vested benefit in certain circumstances—there, if an employee was or could have been terminated for cause; here, if the employee goes to work for a competitor within six months after exercising the vested option.

Judge Eginton concluded that the shares were not "wages" and could therefore be forfeited in accordance with the terms of the plan. His reasons for so holding apply equally here.

█ In support of his holding, Judge Eginton looked at the terms of the bonus plan, whether the employee had fixed compensation in addition to the possibility of an award under the plan and whether the additional compensation was conditioned on considerations outside the employee's actual work. *See id.* at 518. With respect to the terms of the plan, Judge Eginton found that the stock awards at issue "were intended to give the participant a long-term interest in Phibro and defendant" and "served as a means to ensure that plaintiff will continue performing in the defendant's best interests." *Id.* The IBM Plan by its terms has an identical purpose. As in *Rosenberg*, our plaintiff, Mr. Martson, received fixed compensation for his services and participated in the Plan at the discretion of the Plan Administrators. Receipt of a fixed salary generally negates any inference that a separate incentive payment or purely discretionary bonus

constitutes wages. *See Samuels v. Thomas Crimmins Contracting Co.*, 1993 WL 36168, at *7; *Markby v. Painewebber Inc.*, 169 Misc.2d 173, 179, 650 N.Y.S.2d 950, 954 (Sup.Ct.N.Y.1996). Finally, as in *Rosenberg*, granting Martson an award is not contigent on plaintiff's actual work, but rather on the Plan Administrator's conclusion that the employee could make a significant contribution to IBM's success.

Given the virtual identity of relevant facts between this case and *Rosenberg*, I conclude that the stock options granted to Martson are not wages, and that he can be divested of the profits earned on them— even though he has already exercised them—without running afoul of New York's prohibition against forfeiture of earned wages.

*The Divestiture Provision is Not a Restraint on Alienation*

█ Martson next contends that the Plan is unenforceable because it constitutes a restraint on alienation by requiring him either to remain an employee for six months after each exercise of a stock option or to refrain from working in the computer industry (Sixth Affirmative Defense). He is, however, in error.

█ Restraints on alienation are upheld if they are reasonable and are invalid if they are unreasonable or against public policy. *See Benson v. RMJ Security Corp.*, 683 F.Supp. 359, 371 (S.D.N.Y. 1988). An unreasonable restraint on alienation may occur when one party forbids the transfer of property. *See Rafe v. Hindin*, 29 A.D.2d 481, 484, 288 N.Y.S.2d 662, 665 (1968). Here, however, IBM has not forbidden Martson to sell his stock. The forfeiture "handcuffs" unquestionably act as a restraint, but they are a restraint on Martson's ability to go to work for another employer for a few months, not a restraint on his ability to exercise options. The options, having vested, were unrestricted; Martson was free to go into the market and take his profit at any time. A re-

straint on an employee's ability to work for a competitor is not the same thing as a restraint on the alienability of his stock options.

Martson further contends that the provision of the Plan that gives IBM up to two years to rescind the options and demand repayment demonstrates the Plan unreasonably restrains alienation. The logic behind this bald (and bare-bones) assertion is difficult to discern. However, the fact is that IBM rescinded Mr. Martson's options within a matter of two weeks after he left IBM to work at Compaq, so he is hardly in a position to complain that the Plan has been used against him in an unreasonable manner.

*Enforceability of the Divestiture Provision Is Not Affected by the Allegation of Breach of an Implied Covenant of Good Faith.*

■ In his fifth affirmative defense, Martson asserts his belief that IBM has breached its implied covenant of good faith by administering the Plan in an arbitrary, inconsistent and unreasonable manner. Whether or not that is true (and Martson alleges no facts to support his allegation), it is irrelevant to the issue before the Court. A party's action may implicate the implied covenant of good faith only when that action destroys or injures the contract rights of the other party. *See M/A–COM Security Corp. v. Galesi,* 904 F.2d 134, 136 (2d Cir.1990). Martson has not alleged that IBM's supposed arbitrariness or inconsistency in administration of the Plan has injured or destroyed *his* contract rights. Therefore, this contention does not suffice to negate his liability under the divestiture provision.

*IBM's Rights Under the Divestiture Provision are not Defeated by the Doctrine of Unclean Hands*

■ In Martson's seventh affirmative defense, he claims that IBM engaged in activities that made it impossible for him to remain an employee and that it would be inequitable for IBM to profit from its bad faith and unclean hands.

Martson alleges that two individuals, Gene Richter and John Patterson, made his employment conditions untenable in order to preserve the employment of John Patterson. The doctrine of unclean hands, however, is only available when the allegedly bad faith conduct directly relates to the subject matter in litigation. *See Weiss v. Mayflower Doughnut Corp.,* 1 N.Y.2d 310, 316, 135 N.E.2d 208, 210, 152 N.Y.S.2d 471, 474 (1956). Martson's allegations about Richter and Patterson are not directly related to the 1994 Plan or to the enforcement of the stock option agreements. Thus, Martson's claim fails as a matter of law.

*The Applicability of the Employee Choice Doctrine Cannot be Determined at this Time*

Since the stock option awards are manifestly not wages and since the affirmative defenses discussed above do not affect the enforceability of the divestiture provision as a matter of law, IBM argues that it is entitled to enforce the divestiture provision under New York's employee choice doctrine.

■ The divestiture provision in the Plan operates as a short term (six month) covenant not to compete. Ordinarily, a New York court will subject a covenant not to compete to the test of reasonableness. *See Purchasing Assoc., v. Weitz,* 13 N.Y.2d 267, 272, 246 N.Y.S.2d 600, 604, 196 N.E.2d 245 (1963). However, in the context of a benefit compensation plan, New York recognizes an exception to the rule of reasonableness: the employee choice doctrine. Under this rule, an employee who receives benefits conditioned on not competing with the conferring employer has the choice of preserving his benefits by refraining from competition or risking forfeiture of such benefits by exercising his right to compete. In most cases, such a non-compete covenant is enforceable without regard to reasonableness. *See Kristt v. Whelan,* 4 A.D.2d 195, 199,

164 N.Y.S.2d 239, 243 (1st Dept.1957), *aff'd without opinion,* 5 N.Y.2d 807, 181 N.Y.S.2d 205, 155 N.E.2d 116 (1958).

Martson asserts that the most fundamental element of the employee choice doctrine is that the employee is deprived of a future benefit, and that the doctrine does not apply in this case, where the benefit has already been paid. Martson is incorrect. In *Kidd v. Oakes,* 39 Misc.2d 645, 241 N.Y.S.2d 403 (N.Y.Sup.App. Term1963), the trustees of an employees' profit sharing trust brought action to recover payments made to an employee. The defendant, like Martson, had received payment from the plan and subsequently went to work for a competitor in violation of a provision in the plan. The court held, citing the employee choice doctrine of *Kristt,* that the defendant may not retain the money paid to him from the profit sharing plan. *See id.*

Martson also asserts that *Kristt* is not good law, in light of the Second Circuit's decision in *Bradford v. New York Times Co.,* 501 F.2d 51 (2d Cir.1974). There, the Court reviewed the issue of non-compete provisions within a benefit compensation plan and ruled that *all* such provisions are subject to the limitation of reasonableness. *See Bradford,* 501 F.2d at 56. The panel did not follow the employee choice doctrine, explaining that it was not sure the doctrine was still good law because the New York Court of Appeals had not discussed it subsequent to *Kristt. See id.*

■ At the time of *Bradford,* the New York Court of Appeals had not had any occasion to review the covenant within a benefit compensation plan. However, subsequent to *Bradford,* the Court of Appeals reinforced *Kristt*'s continuing viability, at least in certain circumstances. In *Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 48 N.Y.2d 84, 421 N.Y.S.2d 847, 397 N.E.2d 358 (1979), the Court of Appeals held that a forfeiture-for-competition provision in an incentive compensation plan was not enforceable *only* when termination was involuntary and without cause. *Kristt*

remained good law, however, with respect to voluntary terminations, i.e, with respect to termination where the employee makes his own choice. Since *Post,* courts in this and other Circuits have followed the employee choice doctrine in cases where the employee left his job voluntarily. *See Diakoff v. American Re–Insurance Co.,* 492 F.Supp. 1115, 1122 (S.D.N.Y.1980); *Sarnoff v. American Home Products Corp.,* 798 F.2d 1075, 1084 (7th Cir.1986).

■ Therefore, the only bar to applying the employee choice doctrine here would be if Martson had been involuntarily terminated from his job at IBM. There seems to be little doubt that he resigned his position after lining up a lucrative new job with another major player in the burgeoning personal computer industry. However, reading his seventh affirmative defense liberally (extremely liberally), one could conclude that Martson was really alleging, not unclean hands, but constructive discharge by IBM. Of course, constructive discharge is very difficult to prove; the Second Circuit has instructed District Courts to dismiss such claims as a matter of law "...unless evidence is sufficient to permit a rational trier of fact to infer that the employer created conditions so difficult or unpleasant that a reasonable person would be compelled to resign." *Kader v. Paper Software Inc.,* 111 F.3d 337, 341 (2d Cir.1997).

■ Martson alleges in his answer that he believes that "Richter created a supervisory position for Patterson over Martson with the intent of causing Martson's employment conditions to become untenable and causing him to leave IBM." Having a new supervisor brought in, without more, clearly does not rise to the level of intolerability required to sustain a constructive discharge claim. *See e.g., Stetson v. NYNEX Service Co.,* 995 F.2d 355 (2d Cir.1993). (holding defendant's belief that his work was unfairly criticized is not sufficient for constructive discharge); *Ternullo v. Reno,* 8 F.Supp.2d 186 (N.D.N.Y.1998);

*Sanderson v. City of New York,* No. 96 Civ. 3368, 1998 WL 187834, *5 (April 21, 1998)(holding defendant's perceived demotion from change of duties does not constitute constructive discharge as a matter of law). However, at this point in the proceeding, I am loath to conclude that Martson could not prove any set of facts that would entitle him to relief. I therefore grant him twenty (20) days from the date of this opinion to file an amended answer that explicitly asserts a claim for constructive discharge so as to remove him from the ambit of the employee choice doctrine, if that is what he wishes to do.[3] If Martson fails to file such an amended answer, I will, upon being advised of same by counsel for IBM, file an amended decision holding the employee choice doctrine applicable to this case and granting IBM's motion for judgment on the pleadings. If defendant does file an amended answer, IBM will have thirty (30) days within which to take discovery concerning the allegedly intolerable conditions that forced defendant to depart from his job. No other discovery should be necessary, as this will be the only issue for decision. Within twenty (20) days after the deposition is taken, IBM may either (1) move for summary judgment on the ground that the conditions alleged by plaintiff do not, as a matter of law, rise to the level required for a finding of constructive discharge; or (2) notify me of the need for a trial on the issue. If IBM elects the latter course, I will schedule a pretrial conference with an eye to an expedited resolution of this matter.

This constitutes the decision and order of the Court.

---

**3.** In granting leave to amend, I express no view as to the merits. However, in light of the disfavor with which the Second Circuit views allegations of constructive discharge, counsel are reminded of their obligations under Rule 11 with respect to the filing of any such claim.