Paul M. MORRIS, Plaintiff–Appellant,

v.

SCHRODER CAPITAL MANAGE-MENT INTERNATIONAL and SCHRODER INVESTMENT MAN-AGEMENT NORTH AMERICA INC., Defendants–Appellees.

**Docket No. 05–0823–CV.**

United States Court of Appeals, Second Circuit.

Argued: Nov. 7, 2005.

Decided: April 18, 2006.

Frank H. Wright, Frank H. Wright & Associates, P.C., New York, NY, for Plaintiff–Appellant.

Mark G. Hanchet (Christine N. Kearns, Julia E. Judish, Pillsbury Winthrop Shaw Pittman LLP, Washington, DC, on the brief), Pillsbury Winthrop Shaw Pittman LLP, New York, NY, for Defendants–Appellees.

Before: McLAUGHLIN, CALABRESI and B.D. PARKER, Circuit Judges.

B.D. PARKER, JR., Circuit Judge.

We conclude that this case turns on an undecided question of New York law: Is the factual determination of whether an employee was voluntarily or involuntarily terminated under the New York common law employee choice doctrine governed by the "constructive discharge" test from federal employment discrimination law, and, if not, what test should courts apply? We therefore certify this question to the New York Court of Appeals.

## BACKGROUND

The facts are taken from Appellant Paul M. Morris' complaint, and for purposes of this appeal are presumed true. Appellees Schroder Capital Management International ("SCMI") and Schroder Investment Management North America, Inc. ("SIMNA") are wholly owned subsidiaries of Schroders plc ("Schroders"), an investment banking and asset management company with headquarters in the United Kingdom. In January 1997, SCMI hired Morris as a Senior Vice President and head of domestic equities to manage large- and mid-cap United States equity investments and various other segments of SCMI's and Schroders' global operations. SCMI also gave him the responsibility for managing and expanding its United States equity research operations. At that time, Morris had management or advisory responsibility for approximately $6 billion in assets. By the end of 1998, that total had grown to over $7.5 billion. SCMI was merged into SIMNA in 1999, and Morris continued in his position for SIMNA.

In each of Morris' three full years at SCMI and SIMNA—1997, 1998, and 1999—he was paid an annual salary of $225,000 and a year-end bonus, which was signifi-

cantly larger than his annual salary. Each year, SCMI or SIMNA deferred a portion of the bonus and designated it as a deferred compensation award. Various deferred compensation plans governed these awards. Under each plan, deferred compensation did not vest for three years. The plans also contained forfeiture provisions that would trigger if an employee voluntarily quit before the end of the three-year vesting period and accepted employment with a firm Schroders considered a competitor.[1]

In early 1998, SCMI awarded Morris $37,500 as deferred compensation for the calendar year 1997; in early 1999, SCMI awarded him $234,000 for 1998; and, in early 2000, SIMNA awarded him $217,000 for 1999. As previously noted, each of these awards would vest only after three years. In 2000, Morris received a one-time special award from SIMNA of 26,-302.62 shares of Schroders stock, which was also scheduled to vest three years later.

Morris elected to invest the cash portion of his deferred compensation in one of Schroders' mutual funds. As a result of this cash investment and the increase in the price of his stock, the cumulative accrued value of Morris' awards as of the day they were scheduled to vest was approximately $2.9 million.

In February 2000, Morris informed SIMNA that he intended to leave the firm to form a hedge fund, but assured SIMNA that he would remain at SIMNA as long as was necessary to ensure a smooth transition. On April 6, 2000, SIMNA informed Morris that his resignation would be effective April 13, 2000.

Morris claims that he did not leave his job voluntarily, rather SIMNA forced him to leave "because various decisions made by the management of SIMNA and its London based parent company, Schroders plc, in 1999 and early 2000 had the dual effect of emasculating Morris' position and duties as Head of U.S. equities and of ensuring the ultimate demise of the mid and large cap U.S. Equity operation that Morris headed." Compl. at ¶ 59. Morris specifically claimed that SIMNA: (1) reduced the amount of assets over which he had responsibility from $7.5 billion to $1.5 billion; (2) decided to sell off or reduce support to certain of Morris' client groups, which would have further reduced the amount of assets over which he had responsibility to only $800 million; and (3) eliminated the funding for Morris' U.S. Equity research operation. Morris claims that by early 2000 it was clear to him that SIMNA was going to eliminate his position as Head of U.S. Equities and dispose of the entire operation. For these reasons, Morris claims that it was apparent that the company was no longer willing to employ him in the same high level position, with the responsibilities, compensation and career potential he previously enjoyed. Believing he was stuck in a "dead-end job, with drastically reduced responsibilities and income potential," he concluded he had "no practical alternative but to involuntarily leave SIMNA." *Id.* at ¶ 78.

After leaving SIMNA, Morris established a hedge fund in New York, which he

---

1. The 1997 plan defined "voluntary termination" as a "termination initiated by the employee for purposes of seeking employment with a firm which Schroders consider a 'competitor.'" Compl., Ex. A at 3. The 1998 plan defined "voluntary termination" as "termination initiated by the employee." Compl., Ex. B at 3. The 1998 plan provided that "[p]lan awards are not subject to forfeiture in cases of [*inter alia*] death, redundancy, disability, [or] retirement ...." *Id.* at 4. The 1999 plan provided that "[p]lan awards are not subject to forfeiture in cases of: death, redundancy, disability, retirement, disposal of that part of the business ...." Compl., Ex. C at 1.

alleges was neither in actual nor potential competition with SIMNA. On May 23, 2000, the then-Chairman of SIMNA, Ms. Sharon Haugh, notified Morris that he had forfeited his deferred compensation benefits by engaging in a business that competed with Schroders.[2]

Morris then sued for breach of contract to recover his deferred compensation. The district court (George B. Daniels, *J.*) dismissed Morris' claims on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. *See Morris v. Schroder Capital Mgmt. Int'l,* 2005 WL 167608 (S.D.N.Y. Jan.25, 2005). The district court recognized that the New York employee choice doctrine applied to this case, and stated that this doctrine "protects covenants not to compete only where the employee voluntarily left his employment." *Id.* at *3. The district court characterized Morris' argument as follows: "[Morris] argues that SIMNA's covenant not to compete is unenforceable because he was involuntarily terminated through the mechanism of constructive discharge." *Id.* The district court looked to federal employment discrimination law to discern the applicable standards for a claim of constructive discharge in the employee choice doctrine context. *See id.* at *4; *see, e.g., Pa. State Police v. Suders,* 542 U.S. 129, 134, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004) ("[T]o establish 'constructive discharge,' the plaintiff ... must show that the abusive working environment became so intolerable that her resignation qualified as a fitting response."); *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 73 (2d Cir.2000) ("To find that an employee's resignation amounted to a con-

structive discharge, the trier of fact must be satisfied that the working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.") (internal quotation marks and alteration omitted).

The district court ultimately held that Morris' complaint could not "state a claim of constructive discharge, even taking all factual allegations as true," because his "working conditions at the time of his resignation were not so intolerable that a reasonable person would have been forced to leave the job." *Morris,* 2005 WL 167608, at *4. The district court specifically noted that Morris "retained the same job title, received the same salary, and received bonuses each year he worked," and that "in the year 1999 when [Morris] contends his responsibilities were decreased, he was awarded $217,000 in deferred cash compensation and over 26,000 shares of deferred stock." *Id.* The district court concluded that under Second Circuit law, "such circumstances are insufficient to create objectively intolerable working conditions." *Id.; see, e.g., Petrosino v. Bell Atl.,* 385 F.3d 210, 231 (2d Cir.2004) (rejecting constructive discharge claim based on employee's reduced promotion opportunities, where employee retained her job title, pay, and seniority); *Stetson v. NYNEX Serv. Co.,* 995 F.2d 355, 361 (2d Cir.1993) (rejecting constructive discharge claim based on employee's dissatisfaction with work assignments, where employee suffered no reduction in salary or rank, and had been given bonuses or raises yearly); *Pena v. Brattleboro Retreat,* 702 F.2d 322, 325–26

---

**2.** Morris then commenced arbitration proceedings against SIMNA before the National Association of Securities Dealers ("NASD"), in an attempt to recover his compensation benefits. SIMNA then petitioned the New York Supreme Court for a stay of the arbitra-

tion, arguing that SIMNA was not a member of NASD and thus had no legal obligation to arbitrate before them. On March 22, 2001, Morris voluntarily withdrew his NASD statement of claim, without prejudice.

(2d Cir.1983) (rejecting constructive discharge claim based on change in employee's authority and responsibilities, where employee suffered no reduction in salary or rank and disagreement between employee and employer largely concerned business judgments).

This appeal followed.

## DISCUSSION

We review a dismissal under Fed. R.Civ.P. 12(c) "using the same *de novo* standard applicable to dismissals pursuant to Fed.R.Civ.P. 12(b)(6)." *Greco v. Trauner, Cohen & Thomas, L.L.P.*, 412 F.3d 360, 363 (2d Cir.2005). A complaint may not be dismissed under Rule 12(c) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (internal quotation marks omitted).

## I. Issue presented by this appeal

Neither party disputes that New York law applies in this diversity case. The narrow question before this Court is whether "involuntary termination" in the context of New York's employee choice doctrine should be governed by the "constructive discharge" test from federal employment discrimination law.

### A. The New York common law employee choice doctrine

We explored the contours of New York's common law employee choice doctrine in *Lucente v. IBM Corp.*, 310 F.3d 243 (2d Cir.2002). As a general rule, "New York courts disfavor restrictive covenants in the employment context and will generally enforce them only to the extent they are reasonable and necessary to protect valid business interests." *Id.* at 254 (citing *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 690 N.Y.S.2d 854, 712 N.E.2d 1220, 1222–23 (1999); *Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 48 N.Y.2d 84, 421 N.Y.S.2d 847, 397 N.E.2d 358, 359–60 (1979)). However, the employee choice doctrine establishes an important exception to this rule, and "New York courts will enforce a restrictive covenant without regard to its reasonableness if the employee has been afforded the choice between not competing (and thereby preserving his benefits) or competing (and thereby risking forfeiture)." *Lucente*, 310 F.3d at 254 (citing *Post*, 421 N.Y.S.2d 847, 397 N.E.2d at 359–60). As originally explained in *Kristt v. Whelan*, 4 A.D.2d 195, 164 N.Y.S.2d 239 (N.Y.App.Div.1957), *aff'd without opinion*, 5 N.Y.2d 807, 181 N.Y.S.2d 205, 155 N.E.2d 116 (1958), "[i]t is no unreasonable restriction of the liberty of a man to earn his living if he may be relieved of the restriction by forfeiting a contract right or by adhering to the provisions of his contract." *Id.* at 243. Thus, the employee choice doctrine "assumes that an employee who elects to leave a company makes an informed choice between forfeiting a certain benefit or retaining the benefit by avoiding competitive employment." *Lucente*, 310 F.3d at 254 (citing *Kristt*, 164 N.Y.S.2d at 243).

Though we admitted that the "New York courts have not sketched out every detail of the employee choice doctrine," we noted in *Lucente* that the following three elements were "bold and clear":

*First*, an employer can rely on the doctrine only if it can demonstrate its continued willingness to employ the party who covenanted not to compete. *Second*, when an employee is involuntarily discharged without cause, the employer cannot invoke the benefits of the doctrine. Enforcing the non-competition provision under such circumstances would be "unconscionable" because it would destroy the mutuality of obli-

gation on which a covenant not to compete is based. *Third,* the factual determination whether an employee was involuntarily terminated is generally not appropriate for summary judgment.

*Id.* at 254–55 (internal citations omitted) (citing *Post,* 421 N.Y.S.2d 847, 397 N.E.2d at 360–61).

## B. The district court's analysis of the employee choice doctrine

The district court correctly recognized that the New York common law employee choice doctrine controls and that the dispositive question was whether Morris quit or was fired. *See Morris,* 2005 WL 167608, at *3; *cf. Lucente,* 310 F.3d at 254. As previously noted, the district court ultimately analyzed this question by borrowing the constructive discharge standard from federal employment discrimination law,[3] citing *IBM v. Martson,* 37 F.Supp.2d 613 (S.D.N.Y.1999), in support of this approach. *See Morris,* 2005 WL 167608, at *3.[4]

Unfortunately, neither the New York Court of Appeals, nor any other New York state court, has provided guidance on what legal test courts should apply when an employee claims that he was "involuntarily terminated" and that the employee choice doctrine should not apply.[5] In light of this lacuna, we explore whether certification is warranted.

## II. Certification to the New York Court of Appeals

New York law and Second Circuit Rule § 0.27 allow us to certify to New York's highest court "determinative questions of New York law [that] are involved in a cause pending before [us] for which no controlling precedent of the Court of Appeals exists." 22 N.Y.C.R.R. § 500.27; *see State Farm Mut. Auto. Ins. Co. v. Mallela,* 372 F.3d 500, 505 (2d Cir.2004). "Certification is to be used in those cases where there is a split of authority on the issue, where a statute's plain language does not indicate the answer, or when presented with *a complex question of New York common law for which no New York authority*

---

**3.** The fact that Morris used the term "constructive discharge" in his Complaint is of no consequence. *See* Compl. at ¶¶ 79, 97, 108, 119, 130, 141. A complaint need not set out the correct legal theory on which the claim is based, so long as the complaint provides full notice of the circumstances giving rise to the plaintiff's claim. *See Simonton v. Runyon,* 232 F.3d 33, 36–37 (2d Cir.2000) ("[G]enerally a complaint that gives full notice of the circumstances giving rise to the plaintiff's claim for relief need not also correctly plead the legal theory or theories . . . supporting the claim.") (quoting *Marbury Mgmt., Inc. v. Kohn,* 629 F.2d 705, 712 n. 4 (2d Cir.1980)).

**4.** *Martson,* a pre-*Lucente* case decided on a motion to dismiss, stated that the "only bar to applying the employee choice doctrine" would be if the plaintiff alleged facts stating a claim for constructive discharge. *Martson,* 37 F.Supp.2d at 620. We note in passing that *Lucente* called into question the practice of deciding these issues on a motion for sum-

mary judgment, let alone a motion to dismiss on the pleadings. *See Lucente,* 310 F.3d at 255 ("[T]he factual determination whether an employee was involuntarily terminated is generally not appropriate for summary judgment.").

**5.** We again note in passing that *Lucente,* in evaluating whether the plaintiff in that case had "quit or was fired," *Lucente,* 310 F.3d at 254, never once mentioned the constructive discharge standard from the employment discrimination context. If anything, *Lucente* focused on the factual question of whether the *employer* had reneged on its obligation to continue the employment of the employee. *See Lucente,* 310 F.3d at 254–55; *see also SIFCO Indus., Inc. v. Advanced Plating Techs., Inc.,* 867 F.Supp. 155, 158 (S.D.N.Y.1994); *Handel v. Nisselson,* 1998 WL 889041, at *3 (S.D.N.Y. Dec.18, 1998); *Nisselson v. DeWitt Stern Group, Inc. (In re UFG Int'l, Inc.),* 225 B.R. 51, 57 (1998).

*can be found." DiBella v. Hopkins,* 403 F.3d 102, 111 (2d Cir.2005) (emphasis added) (internal quotation marks and alterations omitted). Accordingly, in determining whether to certify a question, our Court considers, *inter alia,* three main issues: (1) "the absence of authoritative state court interpretations of the state statute," *Green v. Montgomery,* 219 F.3d 52, 60 (2d Cir.2000); (2) "the importance of the issue to the state," *id.,* and whether the question implicates issues of state public policy, *see Home Ins. Co. v. Am. Home Prods. Corp.,* 873 F.2d 520, 522 (2d Cir. 1989); and (3) "the capacity of certification to resolve the litigation," *Green,* 219 F.3d at 60.

## A. Is this an unsettled area of New York law?

In *Lucente* we commented that "New York courts have not sketched out every detail of the employee choice doctrine." *Lucente,* 310 F.3d at 254. In fact, the New York Court of Appeals last comprehensively addressed the employee choice doctrine in 1979 in *Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra,* though *Post* did not address the precise issue this case presents.[6] As stated above, the lower New York state courts have not addressed the issue of the proper standard courts should use to evaluate a claim of involuntary termination in the employee choice doctrine context.

## B. Is this an important issue of state law?

This unresolved issue of New York law raises legal and policy issues that we be-

lieve are best resolved by the New York Court of Appeals. As Morris has argued, the standards for constructive discharge in federal employment discrimination may, to some extent, derive from a premeditated policy choice to encourage employees to stay in the employment relationship as long as possible and try to work out their discrimination claims within the work setting and through administrative processes. *See, e.g., Halbrook v. Reichhold Chems., Inc.,* 735 F.Supp. 121, 127 (S.D.N.Y.1990) ("[E]ven where Title VII clearly outlaws discriminatory practices, the standard remedy under the Act is for an employee to stay and fight."); *Nobler v. Beth Israel Med. Ctr.,* 715 F.Supp. 570, 571 (S.D.N.Y. 1989) ("[T]he employee should remain on the job and attack the alleged discrimination from within the context of the employment relationship in order to give the employer an opportunity to ameliorate the effects of the discrimination."). Whether the policy considerations that undergird constructive discharge in the employment discrimination context are at all applicable to the New York common law employee choice doctrine context is a question we believe is best left to the New York Court of Appeals in the first instance.

## C. Is this issue dispositive?

The resolution of this issue determines the outcome of this appeal. If the federal test for constructive discharge applies to involuntary terminations under New York's employee choice doctrine, we would affirm the district court's ruling that, even

---

6. A subsequent New York Court of Appeals dissenting opinion from 1989 briefly mentioned the employee choice doctrine, but only for the general proposition that it was an exception to the normal rules governing the evaluation of non-compete clauses for reasonableness. *See Cohen v. Lord, Day & Lord,* 75 N.Y.2d 95, 551 N.Y.S.2d 157, 550 N.E.2d 410,

415 (1989) (Hancock, *J.,* dissenting) ("[T]he agreement is not contrary to the generally applicable rules which sanction the employee choice doctrine where withdrawing partners must elect between future financial benefits and engaging in competition with former associates.") (internal quotation marks omitted).

assuming the truth of Morris' factual allegations and giving him the benefit of all reasonable inferences, he has failed to plead that the working conditions at SIMNA were "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Whidbee*, 223 F.3d at 73. However, if some other, less-exacting standard applies to the question of whether Morris quit or was fired, we would vacate and remand this case for further proceedings.

## CONCLUSION

We conclude that an unresolved, important and determinative issue of state law is central to this case, and thus certification to the New York Court of Appeals is appropriate. Pursuant to Second Circuit Local Rule § 0.27 and New York Court of Appeals Rule § 500.27, we certify the following questions to the New York Court of Appeals:

(1) Is the factual determination of "involuntary termination" (*i.e.*, whether an employee quit or was fired) under the New York common law employee choice doctrine governed by the "constructive discharge" test from federal employment discrimination law?

(2) If not, what test should courts apply?

The New York Court of Appeals may, of course, reformulate or expand upon these questions as it wishes.

It is hereby ORDERED that the Clerk of the Court transmit to the Clerk of the New York Court of Appeals a Certificate in the form attached, together with a copy of this opinion and a complete set of the briefs, appendices, and record filed by the parties in this Court. This panel will retain jurisdiction to decide the case once we have had the benefit of the views of the New York Court of Appeals, or once that court declines certification. Finally, we order the parties to bear equally any fees and costs that may be requested by the New York Court of Appeals.

## CERTIFICATE

The following question is hereby certified to the New York Court of Appeals pursuant to Second Circuit Local Rule § 0.27 and 22 N.Y.C.R.R. § 500.27, as ordered by the Court of Appeals of the Second Circuit:

(1) Is the factual determination of "involuntary termination" (*i.e.*, whether an employee quit or was fired) under the New York common law employee choice doctrine governed by the "constructive discharge" test from federal employment discrimination law?

(2) If not, what test should courts apply?