10-4163-cv
Amerex Group, Inc. v. Lexington Ins. Co. et al.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

—————————

August Term, 2011

(Argued: November 28, 2011      Decided: May 10, 2012)

Docket No. 10-4163-cv

—————————

AMEREX GROUP, INC., AMEREX USA INC.,
*Plaintiffs-Appellants*,

— v. —

LEXINGTON INSURANCE COMPANY, WESTCHESTER SURPLUS LINES INSURANCE
COMPANY,
*Defendants-Appellees*,

ACE USA,
*Defendant*.

—————————

B e f o r e:

HALL, LYNCH, and CHIN, *Circuit Judges*.

—————————

Plaintiffs-appellants appeal an order of appraisal in the United States District Court

for the Southern District of New York (Harold Baer, *J*.), and the court's subsequent order

confirming the appraisal award and granting defendants-appellees' motion for partial

summary judgment.  Appellants argue that (1) appellees waived their appraisal rights by

failing to invoke them within a reasonable time period, (2) the appraisers exceeded their

power by deciding legal issues, and (3) the appraisal was improperly conducted in violation of appellants' due process rights. Finding these arguments without merit, we affirm the district court's grant of partial summary judgment to appellees and its dismissal of appellants' complaint.

---

DENNIS T. D'ANTONIO, Weg & Myers, P.C., New York, New York (Joshua L. Mallin, Jonathan C. Corbett, *on the brief*), *for Plaintiffs-Appellants.*

MARK L. ANTIN, Gennet, Kallmann, Antin & Robinson, P.C., Parsippany, New Jersey, *for Defendants-Appellees.*

---

GERARD E. LYNCH, *Circuit Judge*:

This case arises from a longstanding insurance dispute between plaintiffs-appellants Amerex Group, Inc., and Amerex USA Inc. ("Amerex"), and their excess insurers, defendants-appellees Lexington Insurance Company and Westchester Surplus Lines Insurance Company ("Excess Insurers"). Amerex initiated this suit on April 23, 2007, in the United States District Court for the Southern District of New York, after nearly four years of investigation of its claim by the Excess Insurers and mediation between the parties. The Excess Insurers responded to the complaint by moving to compel appraisal according to the terms of the insurance policies. The district court (Harold Baer, *J.*) granted the Excess Insurers' motion. In accordance with the parties' contract, each side appointed a member of the appraisal panel ("Panel"), and, when the parties failed to agree on the appointment of the Panel's umpire, the district court

2

appointed one at their request. The fully-constituted Panel conducted its 30-month

valuation and ultimately quantified Amerex's loss at less than the value of its primary

insurance contract, thus rendering the Excess Insurers' policies inapplicable to Amerex's

claims. The Excess Insurers moved thereafter for partial summary judgment[1] on the basis

of this appraisal, and the district court granted the motion, dismissing Amerex's

complaint.

Amerex now appeals both the order to compel appraisal and the subsequent order

confirming the appraisal and dismissing its complaint, arguing that (1) the Excess Insurers

waived their appraisal rights by failing to demand appraisal prior to the initiation of

litigation; (2) the appraisers decided questions of coverage, contrary to New York law;

and (3) the appraisal process became an arbitration with one-sided discovery, thus

violating Amerex's due process rights. We conclude that a demand for appraisal was not

untimely; that the appraisers did not decide questions of coverage; and that the appraisal

procedures did not violate Amerex's due process rights even though the appraisal process

allowed the Excess Insurers to make use of evidence gained through their previous

---

[1] In both the motion to compel appraisal and the motion to confirm the appraisal award once determined, the Excess Insurers moved for partial summary judgment. These motions were appropriate, given the various legal claims that Amerex pressed in its original complaint that the Excess Insurers disputed in their answer that had nothing to do with the question of appraisal, before or after it was conducted. Nevertheless, the granting of the second motion for partial summary judgment fully disposed of the case, as the confirmed appraisal award meant that the Excess Insurers bore no liability under their policies. There is no dispute that the district court's order granting the motion, however styled, was an appealable final order, as it disposed of the entire case by dismissing Amerex's complaint.

3

investigations without allowing Amerex to pursue the additional documentary and testimonial discovery that the company sought. The district court's orders are thus affirmed in all respects.

## BACKGROUND

### I. Facts

The facts in this case are largely undisputed, except where noted. Because the district court granted the Excess Insurers' motion for summary judgment, we review disputed facts in the light most favorable to Amerex. See Amador v. Andrews, 655 F.3d 89, 94 (2d Cir. 2011).

Amerex distributes outerwear in the United States, acting as an intermediary between its wholesale customers and overseas clothing manufacturers. The company stored some of the clothing that awaited shipment to its customers in its warehouse in Avenel, New Jersey, on a large rack system that facilitated the clothing's storage and organization.

On August 3, 2001, the rack collapsed, activating the warehouse's sprinkler system, which flooded the premises. The water not only damaged Amerex's merchandise, but also rendered its computer system inoperable for "one to three weeks," and thus prevented Amerex from making promised deliveries. The damages associated with the collapse included lost merchandise, cancellation of orders, late charges for orders fulfilled, and lost business income.

4

To manage the risk of such losses, Amerex carried three insurance policies. The first, issued by Fireman's Fund Insurance Company ("Fireman's Fund"), served as Amerex's primary insurance, and covered damages associated with the warehouse, business personal property, business income, and other such losses, up to a limit of $2.5 million. The second and third policies, issued by appellees, provided insurance in excess of the Fireman's Fund policy. Each excess policy had a liability limit of $5 million, for a total of $10 million beyond the coverage provided by Fireman's Fund.

The excess insurance policies contained substantially identical clauses that allowed either party to insist in writing on the appointment of an appraisal panel to determine the extent of losses associated with any claim. The appraisal clause does not specify any time limit for making such a demand, and instead focuses on the procedure used to appoint the Panel.

Two years after the rack collapse, on or about June 12, 2003, Amerex submitted its proof of loss to Fireman's Fund and the Excess Insurers, claiming total damages of $8.8 million. Fireman's Fund paid the full amount of its policy; Amerex then sought coverage from the Excess Insurers for the remaining $6.3 million. The Excess Insurers investigated the claim until October 2005. During the course of this investigation, the Excess Insurers interviewed certain Amerex employees concerning the nature of the business and reviewed financial statements and other documents.

At times, Amerex appears to have prolonged the Excess Insurers' investigation. Some documents requested were not immediately forthcoming. The Insurers also

5

requested, but Amerex could not produce, various other documents concerning Amerex's shipping and delivery reports and the quantities and/or prices of merchandise shipped during the period preceding the rack collapse.

Ultimately, on February 21, 2006, the Excess Insurers rejected Amerex's claim on three bases: (1) Amerex's failure to substantiate a number of aspects of its claims, due to the lack of documentary evidence; (2) alternative explanations for the loss of business income that Amerex reported, including the September 11, 2001, terrorist attacks, economic recession, and the bankruptcies of some major customers; and (3) Amerex's improper determination of the proper "restoration period," that is, the date after which business losses could no longer be attributed to the rack collapse or computer failure.

The parties agreed to meet to discuss the terms of the rejection and the Excess Insurers' claim analysis. During the meeting, the Excess Insurers' consultants and forensic accountants discussed with Amerex the findings that led them to recommend rejecting Amerex's claim. After that meeting, in April 2006, the parties agreed to mediate their dispute. In the mediation, the Excess Insurers provided significant documentary evidence to Amerex. Amerex's own experts also presented their calculation of damages to the mediator. In April 2007, after conferring with the mediator, the Excess Insurers made a final offer. Without responding to that offer, Amerex filed the present lawsuit on April 23, 2007.

6

**II. District Court Proceedings**

On June 4, 2007, after Amerex had filed its complaint, the Excess Insurers wrote to Amerex demanding appraisal and answered the complaint the next day, listing the appraisal demand among their affirmative defenses. The Excess Insurers then moved to compel an appraisal. Amerex rejected the demand and contested the motion, claiming that the demand was untimely and was asserted only to preclude Amerex from prosecuting its claim and obtaining discovery. Amerex also argued that appraisal was inappropriate because the nature of its claims would require the appraiser to resolve issues of coverage, which, under governing law, the appraiser was not permitted to do.

The district court granted the Excess Insurers' motion to compel appraisal on September 19, 2007. Subject to the terms of their contract, each party appointed one member of the Panel, and, when the parties could not agree on the Panel's umpire, they petitioned the district court to make that appointment. The district court did so and then stayed the litigation pending resolution of the appraisal.

**III. Appraisal**

In conducting the appraisal, the Panel reviewed documentary and testimonial evidence similar to that reviewed during both the Excess Insurers' initial investigation and the subsequent mediation. The appraisal proceeding included the examination and cross-examination of witnesses, and a day exclusively set aside for Amerex's rebuttal. On June 15, 2010, after almost two and a half years of review, the Panel issued its valuation decision, finding that Amerex's damages amounted to approximately $1.3

7

million, just more than half of the value of Amerex's insurance policy with Fireman's Fund. Pursuant to the parties' agreement, the Panel did not disclose most of its valuation methodology. It did, however, determine that the period of restoration concluded on October 31, 2001. Amerex's appointed Panel member did not register a vote on the appraisal, declining to indicate whether he agreed or disagreed with the Umpire's conclusions.

Because the Panel valued Amerex's losses at less than the $2.5 million the company had already received from its primary insurance carrier, thereby precluding recovery from the Excess Insurers under the terms of their policies, the Excess Insurers moved in district court for summary judgment. The district court granted the Excess Insurers' motion and dismissed Amerex's complaint. In doing so, the district court held, inter alia, that "the appraisal panel . . . evaluated only the amount of loss of income suffered by Amerex" and "did not evaluate, for example, the scope of coverage provided by the insurance policy." Amerex Grp., Inc. v. Lexington Ins. Co., No. 07 Civ. 3259, 2010 WL 3790637, at *2 (S.D.N.Y. Sept. 28, 2010) (internal quotation marks omitted). This appeal ensued.

## DISCUSSION

We review a grant of summary judgment de novo to determine "whether genuine disputes over material fact exist . . . which should properly be submitted to a jury or whether, where no issues of material fact are found, the moving party is entitled to judgment as a matter of law." Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93,

8

101 (2d Cir. 2001). We "resolve all ambiguities and draw all inferences in favor of the non-moving party." Id. Because subject-matter jurisdiction for this suit stems from the parties' diverse citizenship, we apply New York law in interpreting the insurance policies. See Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010). We review de novo the district court's interpretation of New York law. See Salve Regina Coll. v. Russell, 499 U.S. 225, 231 (1991); Highland Capital Mgmt. LP v. Schneider, 460 F.3d 308, 316 (2d Cir. 2006).

On appeal, Amerex claims that (1) the Excess Insurers' appraisal rights were waived because the Excess Insurers failed to invoke them within a reasonable period; (2) the Panel resolved coverage issues, rather than valuation issues, contrary to New York law; and (3) the appraisal was conducted as an arbitration whose discovery structure violated Amerex's due process rights. Amerex misapprehends the law in each respect.

## I. Appraisal Demand

Amerex contends that the Excess Insurers' appraisal rights under the contract were waived, as their June 4, 2007, demand was untimely. Amerex is correct that, notwithstanding the policies' silence on a time limit for the appraisal demand, New York recognizes that the right to require an appraisal "is not indefinite as to time, but must be exercised within a reasonable period." Chainless Cycle Mfg. Co. v. Sec. Ins. Co., 169 N.Y. 304, 310 (1901). We therefore must determine whether the Excess Insurers' delay in making the appraisal demand was "reasonable." In doing so, we recognize that the meaning of that term, in this context, will "depend[] upon the facts of the particular case."

9

Id.  We also recognize that "New York public policy favors an appraisal proceeding over a trial on damages, and under New York law, waiver of the right to an appraisal is not lightly inferred."  SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props. LLC, No. 01 Civ. 9291, 2004 WL 2979790, at *3 (S.D.N.Y. Dec. 1, 2004), citing S & E Motor Hire Corp. v. N.Y. Indem. Co., 255 N.Y. 69, 72 (1930) (internal quotation marks omitted); see also In re Penn Cent. Corp. (Consol. Rail Corp.), 56 N.Y. 2d 120, 127 (1982); In re Delmar Box Co. (Aetna Ins. Co.), 309 N.Y. 60, 63 (1955).

In applying New York law to determine the scope of reasonableness for purposes of appraisal demands, Amerex urges us to accept the rule articulated by the Wisconsin Court of Appeals in Lynch v. American Family Mutual Insurance Co., 473 N.W.2d 515 (Wis. Ct. App. 1991).  The Lynch court held that "absent a policy provision to the contrary, an insurance company may not demand an appraisal of a loss after the commencement of an action by the insured on that loss when the insurance company failed to demand the appraisal prior to the lawsuit even though it had an opportunity to do so."  Id. at 517.  While at least one district court, applying New York law, has expressly considered and rejected the Lynch court's formulation of this rule, see Peck v. Planet Ins. Co., No. 93 Civ. 4961, 1994 WL 381544, at *3 (S.D.N.Y. July 21, 1994), the New York Court of Appeals appears not to have analyzed this issue.[2]  Because of that lack of

---

[2] One New York Court of Appeals case not cited by the parties does address, albeit very briefly, the nexus of a suit's initiation and a demand for appraisal.  In Littrell v. Allemania Fire Insurance Co. of Pittsburgh, Pa., 250 N.Y. 628 (1929), the insured sued the insurance company.  After the trial court dismissed the complaint, the insured demanded appraisal.  Upon intermediate review, the New York Supreme Court's

10

guidance, "we must either (1) predict how the New York Court of Appeals would resolve the question, or (2) certify the question to the New York Court of Appeals for a definitive resolution." Highland Capital Mgmt. LP, 460 F.3d at 316. See also N.Y. Comp. Codes R. & Regs. tit. 22, § 500.27(a) (authorizing certification of "determinative questions of New York law . . . for which no controlling precedent of the [New York] Court of Appeals exists"); Morris v. Schroder Capital Mgmt. Int'l, 445 F.3d 525, 530-31 (2d Cir. 2006).

We resort to certification only sparingly, mindful that, in diversity cases that require us to apply state law, "it is our job to predict how the [New York Court of Appeals] would decide the issues before us." See DiBella v. Hopkins, 403 F.3d 102, 111 (2d Cir. 2005) (internal quotation marks omitted). Therefore, we do not certify questions

---

Appellate Division certified three questions to the New York Court of Appeals. The second is relevant here: "Was plaintiffs' demand for an appraisal, after the first complaint had been dismissed, permitted by the policy?" Id. at 629. In its entirety, the Court's decision is as follows: "Order of the Appellate Division reversed and judgment of the Special Term affirmed, with costs in this court and in the Appellate Division. First and second questions certified answered in the negative; and the third question not answered; no opinion." Thus, while the Court apparently considered that litigation events can be the trigger that results in a party's waiver of its appraisal rights, the facts of that case are quite different from those in the instant case. In Littrell, (1) the same party initiated the litigation and subsequently demanded appraisal, and (2) the party did so after its complaint had been dismissed, terminating the litigation unfavorably. Thus, the triggering event for the waiver was not the initiation of the litigation but its termination, and in any event it is unsurprising for a court to hold that a party waives an appraisal by initiating litigation instead, and waiting to see whether it succeeds or fails before invoking a different dispute-resolution remedy. Here, the question is whether New York law allows one party's initiation of litigation to waive *its adversary's* appraisal rights. The Excess Insurers here never opted for litigation over appraisal, immediately moving to compel appraisal. Littrell thus offers no support for Amerex's position.

11

of law "where sufficient precedents exist for us to make [a] determination." Id. The precedents here provide us with an adequate basis for determining, without certification, that the New York Court of Appeals would not follow the Lynch court in holding that an appraisal demand is automatically rendered untimely once the opposing party has initiated litigation. The New York Court of Appeals has held that the exercise of appraisal rights must occur within a "reasonable" period of time., and that this reasonableness determination must "depend[] on the facts of the particular case." Chainless Cycle Mfg. Co., 169 N.Y. at 310. Because the application of the term "reasonable" requires a fact-sensitive analysis, we interpret the intent of the New York Court of Appeals to allow courts to address questions of timeliness on a case-by-case basis, even after litigation has commenced, as several federal district courts have already done. See e.g., SR Int'l Bus. Ins. Co., 2004 WL 2979790, at *3; Indian Chef, Inc. v. Fire & Cas. Ins. Co. of Conn., No. 02 Civ. 3401, 2003 WL 329054 (S.D.N.Y. Feb. 13, 2003); Peck, 1994 WL 381544, at *3.

In light of the kind of inquiry that New York courts instruct us to make when determining the timeliness of an appraisal demand, we do not believe that the New York Court of Appeals would adopt the mechanistic and fact-insensitive rule that Amerex suggests. Instead, we agree with the framework followed by the district courts that have applied New York law in this area. This framework includes three factors, none dispositive: "(1) whether the appraisal sought is 'impractical or impossible' (that is, whether granting an insurer's appraisal demand would result in prejudice to the insured party); (2) whether the parties engaged in good-faith negotiations over valuation of the

12

loss prior to the appraisal demand; and (3) whether an appraisal is desirable or necessary under the circumstances." SR Int'l Bus. Ins. Co., 2004 WL 2979790, at *3, quoting Peck, 1994 WL 381544, at *2 (internal numbering altered).

We conclude that the New York Court of Appeals would adopt this analytical framework for three reasons. First, these factors allow courts to determine whether waiver is appropriate based on the particular circumstances of each case, which is what New York appellate courts have interpreted the reasonableness inquiry to require, see Chainless Cycle, 169 N.Y. at 310, and which is the usual inquiry signified in the law by the term "reasonableness." And "the inconvenience of bringing suit is just one circumstance to be considered in determining whether a delay in demanding appraisal was unreasonable." Sch. Dist. No. 1 of Silver Bow County v. Globe & Republic Ins. Co. of Am., 404 P.2d 889, 893 (Mont. 1965). In some cases, the initiation of litigation may well be the appropriate event that triggers a party's waiver of its appraisal rights. In other cases, that will not be so, particularly where investigation or mediation of the dispute is still ongoing when the litigation is filed.

Second, the doctrine of waiver appropriately focuses on the actions – or inaction – of the party against whom waiver operates: a waiver is "the voluntary and intentional relinquishment of a known right, which is not created by negligence, oversight, or silence." Plato Gen. Const. Corp./EMCO Tech Const. Corp. v. Dormitory Auth. of State, 932 N.Y.S.2d 504, 511 (2d Dep't 2011). Amerex's proposed rule undermines this principle. An adversary's decision to initiate litigation is outside of the party's control,

13

thus taking the party's rights out of its own hands and placing them into the hands of its adversary. Similarly, while there may be instances where the initiation of litigation is the appropriate boundary for determining the timeliness of a demand, it cannot be the default rule, as such a default would encourage the premature initiation of litigation in derogation of contractually-favored alternative dispute mechanisms such as appraisal and mediation. See Terra Indus., Inc. v. Commonwealth Ins. Co. of Am., 981 F. Supp. 581, 601 (N.D. Iowa 1997) (applying Iowa law).

And third, the Lynch court's rigid rule is in the minority: while many jurisdictions appear not to have reached this question, and some have done so only recently, see Rogers v. State Farm Fire & Cas. Co., 984 So. 2d 382 (Ala. 2007), our research has discovered only a single case in Kentucky that appears to follow a rule similar to the one announced in Lynch. See Continental Ins. Co. v. Vallandingham & Gentry, 76 S.W. 22, 24 (Ky. App. 1903). ("Unless the insurer asks for the arbitration or appraisal before suit brought [sic], the failure to appraise is not a defense."). Even in Kentucky, no case since 1944 has cited Continental Ins. Co. for this or any other proposition. See Upington v. Commonwealth Ins. Co. of N.Y., 182 S.W.2d 648, 650 (Ky. 1944). Moreover, at least one other court applying state law, besides those applying New York law cited above, has expressly noted the Wisconsin rule and rejected it. See Terra Industries, Inc., 981 F. Supp. at 601.

The Lynch court itself relies on Hayes v. Allstate Ins. Co., 722 F.2d 1332, 1335 (7th Cir. 1983). While the Hayes court did state that a policy must "expressly provide

14

that no action may be maintained upon it until after the amount of loss is determined by appraisal" in order for a post-litigation appraisal demand to be effective, there is reason to question the continued authority of this decision. The <u>Hayes</u> court, sitting in diversity, applied broad principles of Indiana insurance law to reach its conclusion. <u>Id</u>. But as the <u>Lynch</u> court acknowledges, an Indiana court has, post-<u>Hayes</u>, rejected the rule that <u>Hayes</u> appears to endorse, finding that a post-litigation appraisal demand by the defendant did not result in waiver "when no evidence of prejudice resulting from the delay in demanding appraisal was presented to the trial court." <u>Monroe Guar. Ins. Co. v. Backstage, Inc.</u>, 537 N.E.2d 528, 529 (Ind. Ct. App. 1989). We regard the Indiana court's interpretation of Indiana law as more authoritative than the conflicting federal decision.

Those courts that have addressed the issue have generally embraced a more flexible approach similar to the one utilized by federal district courts applying New York law. <u>See</u> <u>Rogers</u>, 984 So. 2d at 387-88 (Alabama); <u>Monroe Guar. Ins. Co.</u>, 537 N.E.2d at 529 (Indiana); <u>School Dist. No. 1</u>, 404 P.2d at 893-94 (Montana); <u>Hanby v. Md. Cas. Co.</u>, 265 A.2d 28, 31 (Del. 1970); <u>see</u> <u>also</u> <u>Terra Indus., Inc.</u>, 981 F. Supp. at 601. Given the scant authority in favor of the <u>Lynch</u> court's rule, the support for a more flexible rule expressed in the multiple other jurisdictions to have considered the question, and the rule's other debilities cited above, we are confident that the New York courts would not join Wisconsin in this respect.

Applying the framework set forth above, we conclude that the Excess Insurers did not waive their appraisal rights by asserting them after Amerex initiated litigation. The

15

first factor, whether the appraisal demand would "result in prejudice" to the non-demanding party, <u>SR Int'l Bus. Ins. Co.</u>, 2004 WL 2979790, at *3, must be assessed as of the time the demand is made, without the benefit of knowing how the appraisal unfolded after that demand. That the appraisal ultimately lasted three years is, therefore, of no moment for our analysis. Viewing the Excess Insurers' demand from that perspective, we see no reason to have expected that the appraisal process would be unduly burdensome for either party. Amerex's challenges of the Panel's ultimate valuation and the time taken to reach that valuation are merely post-hoc criticisms of the appraisal process and results and do not provide a reason why the district court should have anticipated at the time the appraisal was demanded that the appraisal would prejudice Amerex. Had the appraisal been conducted more expeditiously, and reached a result more favorable to Amerex, the prejudice Amerex claims would not have occurred. Nor is it clear that the actual appraisal process was more complex and time-consuming than litigation would have been, particularly in light of the fact that litigation would likely have resulted in motion practice addressed to assorted coverage issues raised in the Excess Insurers' Answer before the ultimately dispositive valuation of the claim even commenced.

Amerex argues that the long delay between the rack collapse and the appraisal demand suggested that the Excess Insurers' appraisal demand would prejudice Amerex. The argument is unconvincing. Although the separation between the collapse and the appraisal demand was significant – almost six years – it is undisputed that much of the delay was due to Amerex's inaction. The Excess Insurers assert, and Amerex does not

16

dispute, that Amerex refused to interact with the Insurers between the date of the collapse and the presentation of its claim almost two years later. Moreover, the Insurers' subsequent two-year investigation included significant, apparently avoidable delays due to Amerex's failure to promptly produce documents necessary to the investigation. Indeed, many of the Excess Insurers' claims in mediation dealt with Amerex's failures to produce the information sought.

The second factor asks whether the parties have engaged in "good-faith negotiations over valuation of the loss prior to the appraisal demand." SR Int'l Bus. Ins. Co., 2004 WL 2979790, at *3. If so, a party's appraisal demand in the midst of negotiations is likely to be timely. The Excess Insurers' demand satisfies this test. That the insurers made a settlement offer just two weeks before Amerex filed suit, while mediation was still in progress, demonstrates that negotiations were continuing when the lawsuit was filed. It was Amerex, not the Excess Insurers, that terminated the mediation and settlement negotiations by initiating this action. Although Amerex claims that the appraisal demand was designed to deny it the opportunity to conduct discovery, in light of the evidence adduced above, we find no reason to conclude that the parties' ongoing negotiations and the Excess Insurers' previous investigation had been conducted for any purpose other than the fair resolution of Amerex's claims.

The final inquiry is whether an appraisal is "desirable . . . under the circumstances." Id. The factors relevant to inquiry include, among other factors, whether the appraisal is likely to facilitate a speedier resolution of the dispute than would occur in

17

the district court proceeding; the expected expertise of an appraisal panel in making its valuation determinations; and the complexity of the valuation. Here, at the time the Excess Insurers made their demand, the district court's expressed expectation was that the appraisal process would facilitate a prompt resolution to an extended, complicated, wholly factual dispute concerning the extent of Amerex's damages, and that the Panel would be sufficiently expert to resolve the questions placed before it. It was eminently reasonable for the district court to conclude that, if the value of the claim could be authoritatively fixed, the parties might well be able to resolve the dispute by settlement, without the need to address legal issues regarding coverage.

All of these factors suggest that the appraisal was thus "desirable . . . under the circumstances" when the demand was made. Id. The district court expressly anticipated that the appraisal process would lead to a prompt resolution of the most basic dispute between the parties. Given the parties' own participation in selecting the members of the Panel, the parties could help to ensure the Panel's expertise. Moreover, the complexity of the valuation undertaken here is beyond dispute. The widely differing valuations of lost business income advanced by each party and the length of the investigations conducted by the primary insurer, the Excess Insurers, and the mediator suggest that determining the valuation of Amerex's loss is highly technical and time-consuming. Such complexity – or lack thereof – is precisely why determining the timeliness of an appraisal demand is such a fact-intensive affair. In cases where insurance companies have ample experience and the valuation investigation is routine – such as damage to an insured's house

18

following a hurricane – the reasonable period during which the parties can demand appraisal will likely be relatively short. See, e.g., Sanchez v. Prop. & Cas., Ins. Co. of Hartford, No. H-09-1736, 2010 WL 413687 (S.D. Tex, Jan. 27,. 2010) (holding that a near one-year delay in making an appraisal demand was unreasonable on the facts of that case). But the reasonable length of time during which appraisal can be demanded correlates directly with the complexity and novelty of the valuation: the more complex the valuation, the longer the period during which a party can assert its appraisal rights.

In light of the foregoing analysis, we conclude that, under New York law, the Excess Insurers did not waive their contractual appraisal rights, and that their demand for appraisal was timely.

## II. Scope of Appraisal

Amerex next contends that the district court should not have upheld the appraisal award because the Panel improperly decided questions of law. Amerex correctly identifies the limit to an appraisal panel's authority under New York law. A basic proposition of insurance law provides that "the scope of coverage provided by an insurance policy is a purely legal issue that cannot be determined by an appraisal, which is limited to factual disputes over the amount of loss for which an insurer is liable." Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 384, 389 (2d Cir. 2005); see also Indian Chef, 2003 WL 329054, at *3; 15 Couch on Ins. § 210:42 (3d ed. 2011). Amerex errs, however, in its application of that principle to the facts at hand.

19

In many cases, distinguishing between "coverage" and "amount of loss" will be straightforward. For example, in Kawa v. Nationwide Mutual Fire Insurance Co., 664 N.Y.S.2d 430 (N.Y. Sup. Ct. 1997), a wind storm damaged the insured's house. After an inspection, the insurance company tendered its settlement offer. The insured rejected the offer and sued, demanding appraisal.[3] The dispute concerned whether the policy required the insurer to repair the house only to its predamaged condition, or, as the insured contended, to replace the house's damaged aluminum siding with vinyl siding. Id. at 431. The court denied the insured's motion to compel appraisal, deeming the dispute one of coverage, rather than damages. Id. Kawa illustrates the legal principle. It was for a court to interpret the policy to resolve the dispute, as an appraiser's assessment of the value of the claim would depend upon the resolution of that legal question. Id. at 431-32.

The distinction between coverage and damages becomes more difficult when, as here, the insured seeks coverage for lost business income. In some cases, the policy itself specifies the method of calculating lost business income. See, e.g., HTI Holdings, Inc. v. Hartford Cas. Ins. Co., No. 10-cv-06021, 2011 WL 4595799, at *13 (D. Or. Aug. 24, 2011). In others, the calculation is necessarily speculative and involves complex apportionments of competing causal factors. Moreover, the calculation of the restoration period, or period during which business income losses can be attributed to the covered

---

[3] Notably, the Kawa court did not address whether the insured's initiation of the suit waived its right to an appraisal. The opinion suggests that New York litigants and courts may no longer be cognizant of the brief and cryptic decision of the New York Court of Appeals in Littrell, 250 N.Y. at 628.

20

event, can broach both legal and factual elements, creating a boundary that will require careful analysis to delimit.

The Southern District of New York's treatment of this boundary in the context of business income losses is instructive. Duane Reade, Inc. v. St. Paul Fire & Marine Insurance Co., 261 F. Supp. 2d 293 (S.D.N.Y. 2003) ("Duane Reade I") and Duane Reade, Inc. v. St. Paul Fire & Marine Insurance Co., 279 F. Supp. 2d 235 (S.D.N.Y. 2003) ("Duane Reade II") concerned a dispute between Duane Reade, Inc., and its insurer St. Paul Fire & Marine Insurance Company, after the destruction, on September 11, 2001, of one of Duane Reade's pharmacies located near the World Trade Center. St. Paul Fire demanded an appraisal to determine the precise scope of the restoration period. The parties disputed the policy's coverage on this point: Duane Reade asserted "a right under the policy to recover business interruption losses for the entire period until the World Trade Center is rebuilt (if it is)," while St. Paul Fire insisted that the "plaintiff's recoverable losses are limited to those suffered within 21 months following the terrorists [sic] attacks." Duane Reade I, 261 F. Supp. 2d at 294. Thus, the argument in Duane Reade I did not concern the factual determination of the restoration period's end date, but whether the policy calculated that period with reference to an exogenous event – the reconstruction of the World Trade Center.

The district court in Duane Reade I appropriately reserved the determination of that legal dispute for itself, rather than delegating it to an appraisal panel. See also Indian Chef, 2003 WL 329054, at *3 (concluding that, because the "parties disagree[d] about

21

which provisions of the policy apply to the calculation of lost business income," the question was one of coverage rather than damages). Once the legal question was resolved, the factual question of determining the actual date of the restoration period was well within the appraisal panel's scope. In Duane Reade II, the district court resolved the legal question by dismissing both sides' interpretations of the policy as extreme, concluding that, on the facts of that case, the appropriate scope of the restoration period was the "time it would take to rebuild, repair, or replace" the damaged property. 279 F. Supp. 2d at 239. Once the district court had clarified the scope of the period of restoration within the meaning of the policy, defining that specific period was a sufficiently factual question to allow resolution by the appraisal panel. Id. at 242.

The Duane Reade cases illustrate three principles of New York law. First, an appraiser may not resolve coverage disputes or legal questions regarding the interpretation of the policy. Second, the calculation of the restoration period, unless subject to legal challenges, is a factual question about damages – albeit sometimes a complex and contentious one – appropriately addressed by an appraiser. And third, the presence of a coverage dispute does not preclude an appraisal demand. Only a coverage dispute that precedes the valuation of damages will prevent such a demand. Coverage disputes that are independent of the valuation of damages can stand in abeyance pending the appraisal.

The Panel's valuation of damages did not violate these principles. While the present dispute certainly included legal arguments concerning the policy's coverage,

22

those disputes were not implicated in the appraisal's resolution. The Panel instead focused solely on determining the extent of the damages, including calculating the relevant restoration period, and did not address whether the Excess Insurers' policies covered those damages. Thus, the Panel did not address conflicting views of the applicable policies, but rather resolved factual questions regarding claims about the conflicting causes of the lost business income. Those were factual questions that can be resolved by a duly appointed appraisal panel, aided by the opinions of experts, including forensic accountants such as those who testified before the Panel below.

One of the principal issues before the Panel, for example, was when the effect of the rack collapse stopped influencing the decline of Amerex's business, such that the weak state of its revenues in contrast to prior years could be attributed to other, independent business conditions unrelated to the casualty. That is essentially a factual question about business conditions; it is to be resolved by making factual judgments about events in the world, not legal analyses of the meaning of the insurance contract. The parties contracted to submit such factual issues bearing on the value of the claim to a panel of appraisers rather than to the courts.

The Panel's decision was obviously controversial. Such controversy is not unexpected. Apportioning damage causation from among the many factors that influenced the state of Amerex's business in the summer and fall of 2001 – including the rack collapse, the 2001 recession, the September 11 terrorist attacks, and the bankruptcies of several of Amerex's leading customers – was a factually laborious task that might have

23

led to widely differing outcomes. The appraisal necessarily involved the exercise of judgment and discretion in weighing competing arguments regarding causation and loss.

That an appraisal panel exercises judgement or produces a controversial result, however, does not turn factual disputes regarding damages into legal disputes regarding coverage. The complexity of the calculations of Amerex's business losses required appraisers to do more than mechanistically consult objective market values. But while the Panel made a complex decision among several competing factual theories, it did not adjudicate the law. For Amerex to succeed in challenging the Panel's decision as ultra vires, it must identify the questions regarding the meaning of the policy that the Panel decided. Amerex does not and cannot make that identification. Beyond conclusory assertions that the valuation must necessarily have addressed coverage questions, Amerex has failed to identify any specific legal issue of contract interpretation that either the Panel decided or that was necessary to untangle the factual question of whether and to what extent Amerex's business fortunes were attributable to the insured event.

## III. Due Process

Finally, Amerex argues that the appraisal process itself turned into an arbitration that violated its due process rights. More specifically, Amerex alleges that it suffered a due process violation because the Excess Insurers could use the results of their investigation in the appraisal proceedings, while Amerex lacked a corresponding right to seek discovery from the Excess Insurers regarding their own investigation. This argument is unavailing.

24

Amerex is correct that New York law recognizes significant differences between the authority and procedures applied in appraisals as opposed to arbitrations. The distinction between the two is required by statute: an appraisal, if ordered, "shall proceed pursuant to the terms of the applicable appraisal clause of the insurance policy and not as an arbitration." N.Y. Ins. Law § 3408(c). The distinction refers both to the scope of the appraiser's authority and to the procedures to be followed. As the New York Court of Appeals has noted, an "arbitration generally resolves the whole controversy between the parties and results in confirmation and the entry of judgment on the award, while appraisal resolves only a valuation question leaving all other issues for resolution at a plenary trial." In re Penn Cent. Corp., 56 N.Y.2d at 127. Procedurally, "the prevailing practice in appraisals is more informal and entirely different from the procedure governing arbitration." Id. (internal quotation marks and brackets omitted).

Amerex asserts that the Panel failed to recognize these distinctions, and thereby transformed an appraisal into an arbitration. Moreover, Amerex further asserts that because this "arbitration" did not grant Amerex the procedural rights usually associated with arbitrations – principally extensive discovery relating to the Excess Insurers' own investigation of Amerex's claim – the Panel violated its due process rights. This argument suggests a misunderstanding of the nature of insurance appraisals. Insurance investigations are necessarily one-sided: the insurer seeks to validate and quantify the extent of the damages asserted by the insured. But the insured receives no corresponding right to investigate the investigation. Indeed, if the scope of the appraisal is strictly to

determine the value of the damages that flowed from the covered event, it is unclear what benefit would come from allowing the discovery that Amerex seeks. It was Amerex, not the Excess Insurers, that possessed facts relevant to its business and the losses attributable to the rack collapse.

In litigation or arbitration, the benefits of such discovery are obvious. Among other claims, the insured can assert – and then attempt to locate the evidence to prove – that the insurer lacked good faith, made material misrepresentations in its previous investigation, failed to consider one or another factors in reaching its conclusions, or otherwise failed to live up to its contractual obligations. Amerex stood ready to make many of these arguments to the district court, the appropriate forum for such claims. But, as noted above, the Panel did not resolve questions of coverage, and there were ultimately no issues in the case regarding the Excess Insurers' contractual obligations in handling or denying of the claim. The principal task of the Panel was limited to determining the extent of the business losses attributable to the covered casualty, as distinct from other causes of business decline. In conducting that task, the Panel followed precisely the "informal" practice appropriate to appraisal proceedings, rather than the kind of formal, trial-type procedures, including extensive discovery, that are typical of litigation. When the Panel determined that the extent of the loss was within the limits of Amerex's primary insurance policy, the inexorable results of that *valuation* decision were that Amerex had no claim against the Excess Insurers, and no further legal questions needed to be

addressed to resolve the dispute. There was accordingly no requirement or need for Amerex to receive the discovery that might have attended an arbitral or court proceeding.

Thus, while Amerex went into the appraisal with significantly less information about the Excess Insurers than the Excess Insurers had about Amerex, there was no violation of Amerex's due process rights. It cannot be the rule that appraisals must furnish insured parties the right to extensive discovery from the insurers, as such a rule would turn appraisals into precisely the kind of quasi-judicial proceedings that New York law forbids. We therefore conclude that the appraisal's procedures did not violate Amerex's due process rights.

## CONCLUSION

We have considered Amerex's remaining arguments and consider them to be without merit. For the foregoing reasons, we AFFIRM the judgment of the district court in all respects.